759 A.2d 1107

**Kimberly Michelle HRICKO**

v.

**STATE of Maryland.**

**No. 255, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Sept. 27, 2000.

Christopher A. Griffiths (Roberts & Wood, on the brief), Riverdale, for appellant.

Gary E. Bair, Asst. Atty. General (J. Joseph Curran, Jr., Atty, General, Baltimore and Scott G. Patterson, State's Atty. for Talbot County, Easton, on the brief), for appellee.

Argued before MOYLAN, THIEME and SONNER, JJ.

MOYLAN, Judge.

**"The play's the thing**
**Wherein I'll catch the conscience of the King"**

*. . . Hamlet*
**Act II, Scene ii**

Taking that version of the facts most favorable to the State, what unfolds is the melodrama of an estranged wife, desperate to free herself from a marriage gone stale, leaving a trail of false clues and staging her husband's death so as to make it appear a random accident. As with "The Murder of Gonzago" in *Hamlet* or "Pyramis and Thisbe" in *A Midsummer Night's Dream,* there is within this real-life drama a play within a play. In the real-life drama, the husband was lured to the scene of his fatal poisoning by the reconciliatory promise of a romantic St. Valentine's weekend at the Harbourtowne Resort in St. Michael's. A highlight of the getaway weekend was a dinner-theater murder mystery which the dinner guests were invited to solve. That play within a play was called "The Bride Who Cried." Our real-life drama may well be called "The Widow Who Lied."

**"Sleeping within my orchard,**
**Upon my secure hour thy uncle stole,**
**And in the porches of my ears did pour**
**The leperous distilment"**

*. . . Hamlet*
**Act I, Scene v**

In the real-life drama, the last hours of the ill-fated marriage began with a bottle of champagne provided by the host to each "romantic" couple on their arrival at the inn. In the play within a play, the wedding feast ended with a champagne toast proposed by the groom to his bride and shared by the actors and participating guests alike. In the play within a play, the bridegroom died as he drank from the poisoned chalice. In the real-life drama, the husband died of poison within an hour of returning with his wife to their cottage. The audience identified the culprit of "The Bride Who Cried" within the hour of the staged murder. In the real-life drama, the appellant, Kimberly Michelle Hricko, was not indicted for her husband's murder until three-and-a-half months after her staging of his accidental death. Truth is both stranger and more complicated than fiction.

"Thus hath the course of justice whirled about"

... *Richard III*
Act IV, Scene iv

A Talbot County jury, presided over by Judge William S. Horne, convicted the appellant of first-degree murder and first-degree arson. On this appeal, she raises the three contentions

1) that the evidence was not legally sufficient to support the conviction for arson;

2) that the evidence was not legally sufficient to support the conviction for murder; and

3) that the medical examiner should not have been permitted to testify that the cause of death was "probable poisoning."

"Happy families are all alike;
every unhappy family is unhappy in its own way."

... The opening line of
*Anna Karenina*

Nine years into their marriage, Steven and Kimberly Hricko were an unhappy family. Time was when the domestic skies had been brighter. Mike and Maureen Miller were the couple closest to Steven and Kimberly Hricko from the time of their first meeting and earliest courtship. All four close friends were either natives of State College, Pennsylvania, or students there while attending Penn State or, for three of the four, both.

Steven Hricko and Mike Miller became mutual best friends in the seventh grade in the town of State College and maintained that friendship through the day of Steven's murder. Mike Miller had met his future wife, Maureen, when she was an undergraduate at Penn State in 1984. They dated steadily after that. It was Maureen who first met Kimberly, as they worked together as waitresses at a steakhouse in State College. It was Mike and Maureen Miller who then introduced Kimberly to Steven Hricko. "We introduced them and we went out on a double date and from that point on they seemed to hit it off." As Maureen testified, "We went out on a double date one evening and Steve fell in love with Kim immediately."

When Steven and Kimberly were married in March of 1989, Mike Miller was Steven's best man and Maureen Miller was Kimberly's maid of honor. When Mike and Maureen, in turn, were married a few months later, Steven Hricko was Mike's best man and Kimberly Hricko was Maureen's matron of honor. Within a year of their marriage, Steven and Kimberly gave birth to a daughter, Anna, who was nine years of age at the time of her father's murder.

Steven Hricko and Mike Miller took up the same occupation, the superintending and maintaining of golf courses. In the years after State College, Steven Hricko was the superintendent of golf courses in Western Pennsylvania; in Dundalk, Maryland; and, beginning in the early 1990's, at the Patuxent Greens Golf Course near Laurel, Maryland. Mike Miller's career route took him first to New Jersey and then, in October of 1993, to the Harbourtowne Golf Course in St. Michael's. Throughout the intervening years, and particularly

after they were both settled in Maryland, the two couples maintained close contact with each other.

Kimberly Hricko was a certified surgical technologist, assigned to the operating room, first at Holy Cross Hospital from 1995 through December of 1997 and after that at Suburban Hospital. Included in her responsibilities as a surgical technologist in the operating room was disposing of all unused medicines and drugs following an operation.

It was Mike Miller who was responsible for bringing the Hrickos to Harbourtowne on the fateful St. Valentine's Day. Steven had telephoned him sometime in January and indicated that he "was looking for somewhere to go with Kim to spend a romantic evening." The agenda was "to work on the marriage." Mike knew that Harbourtowne, where he worked, "was having this Valentine's getaway weekend with the dinner theater" and suggested it as a possibility. Steven seized the idea and Mike intervened to make certain that the Hrickos would have one of the better cottages with a view of the Miles River. Mike and Maureen Miller even offered to baby-sit for nine-year-old Anna, although that offer was never taken up. Their motivation was clear, to give Steven and Kim "this time away." As Mike Miller testified:

> Maureen and I offered, knowing that *Kim and Steve were having some problems* prior to that and knowing that *they both were going to come down here to work on the marriage* or view it as a first date. Maureen and I suggested that *they needed this time away.*

(Emphasis supplied).

Kimberly's disenchantment with her marriage was in a relatively low key until November of 1997. In addition to Mike and Maureen Miller's awareness that the Hrickos "were having some problems" with their marriage, a number of Kimberly's close friends were also fully apprised of growing discord. Theresa Armstrong was a friend and former neighbor from Laurel. When she on one occasion asked Kimberly to "explain her unhappiness" with Steven, she received essentially the following reply:

Basically that there was a lot of verbal abuse. He didn't do anything. She did everything. She was just completely unhappy with him anymore. She didn't want to be married to him.

Norma Walz was a former co-worker at Holy Cross Hospital. Kim described to her the state of her marriage:

[S]he said that she had been feeling really bad about their marriage for a long time.... She said that her and Steve had been having problems and had been having problems for a very long time. I told her that I had always suspected that something wasn't right, but she would never confide in me and she agreed that she had been living a lie, she said, for a long time. She said that she had asked him to go to counseling sometime back in the late summer of '97.

Jennifer Gowen was also a co-worker of Kimberly's at Holy Cross Hospital. When she got married in November of 1997, Kimberly was her matron of honor. At the time of the final wedding preparations, the two discussed Kimberly's marriage:

[Kimberly said] that she was not happy in her marriage; that she was considering possibly getting a divorce. After my marriage, after the honeymoon, when I got back two weeks later, we had more conversations.

Rachel McCoy had been a friend of Kimberly since their days together in State College. Over the years, they talked at least once a week. In September or October of 1997, Kimberly confided in Rachel:

She told me that she had been looking into getting a divorce, that she wasn't happy in her marriage. That was really about it.

Q: Did she express at all how she felt about him?

A: She felt that he wasn't very helpful around the house or he didn't like to go out and do stuff with her. She was much more outgoing than he was and that really bothered her and it started to bother her more over the years.

Thus far the low-pitched marital discord was, at worst, such stuff as divorce suits are made of and not the driving force behind murder.

**"Cupid is a knavish lad,
Thus to make poor females mad."**

*... A Midsummer Night's Dream*
**Act III, Scene ii**

Between Thanksgiving and Christmas of 1997, however, Kimberly's smouldering discontent burst into raging claustrophobia. What was the spark? *Cherchez l' autre homme!* He arrived during the last week of November.

Jennifer Gowen was to be married on November 29 and Kimberly was to be her matron of honor. One week before the wedding, Kimberly hosted a bachelorette party for Jennifer in Easton. It began at the home of Maureen and Mike Miller and later adjourned to a restaurant and bar, which the partygoers closed at 1:30 A.M. Several days later, Kimberly threw a shower for the bride at the Hricko home in Laurel. The next day, the wedding party spent most of Thanksgiving Day at the Hricko home.

At the very outset of that festive week there appeared at the edge of the crowd, like Darcy in *Pride and Prejudice* or Rhett Butler's dark stranger from Charleston, an enigmatic new figure. Brad Winkler was the 23–year–old cousin of the bride and a sergeant in the United States Marine Corps assigned to the Pentagon. Though ten years her junior, he immediately caught the eye of the discontented matron of honor. He reappeared at every event during the pre-nuptial week and increasingly was seen closeted in private conversation with Kimberly. Invariably, the two lingered after the rest of the guests had gone. Norma Walz noticed that "Brad was ever-present."

Initially, Kimberly was simply a good listener. Norma Walz described a conversation she had with Kimberly

in the car, after we dropped Brad off. *Brad had spoken of a bad marriage that he'd had* and *a pretty sad sob story.* And after he got out of the car *she made comments like* oh, he's such a nice guy and *the girl who'll catch him,* you know, *is going to be a lucky one.* And, you know, he's really sweet and he's really nice and too bad what she did.

(Emphasis supplied).

As the only male other than the host at the wedding shower at the Hrickos, Brad did not totally escape the notice of Steven Hricko. Again, Norma Walz described a conversation with Kimberly:

Kim had mentioned that *Steve had gotten kind of ticked off* and kind of *wondering,* you know, *who's this guy,* you know, *what's he doing hanging out here,* you know, *party's over.* You know, *it's a wedding shower anyway.* And the next day Kim told me oh, Steve was just a little jealous because, you know, Brad was hitting it off so well with Anna [the Hricko's daughter].

(Emphasis supplied).

The smouldering tinder of late November burst into flame in early December. As a dutiful cousin, Brad volunteered to be both the house-sitter for the honeymooning couple and the occasional baby-sitter for the honeymooners' year-old daughter. During that period, Kimberly went over on a daily basis to help Brad with his chores and to give him helpful pointers. Brad himself pinpointed the moment when the companionship turned sexually active:

I think it was that Friday night. I kissed her or she kissed me. That weekend, I believe, is when it started.

Q: And where would you have your intimate interludes?

A: First several times was at Shawn's and Jen's townhouse.

Q: And they were still on their honeymoon?

A: Yeah, they were still on their honeymoon.

Q: After that, where would you meet?

A: At my aunt's house where I lived.

As the affair reached the combustion point, the incendiary effect on Kimberly was such that she virtually lost all semblance of control. Compulsively, she telephoned Jennifer Gowen several times while Jennifer was still on her honeymoon and intimated that she was about to have an affair with Jennifer's cousin, Brad. When Jennifer Gowen returned from her honeymoon in mid-December, Kimberly immediately informed her of developments in lurid detail:

She told me that they were having sex and that she was becoming more dissatisfied with her marriage to Steve. She told me that they met while I was on my honeymoon at my house to have sex and that she spent quite a lot of time with him while I was away.

At about the same time she informed Jennifer Gowen of the extra-marital relationship, she was also on the long-distance phone to Norma Walz in Port Orchard, Washington. Again incautiously, she could not contain the fact that she "was having an affair with Brad" and that "he was very affectionate and she really loved him." It was on New Year's Eve at a restaurant in Laurel that she informed her former neighbor Theresa Armstrong that she was having an "affair . . . with her friend Jenny's cousin; his name is Brad." It was half-way through January when Kimberly met with Rachel McCoy, her old friend from State College, and informed her that "she was seeing somebody else." She then offered, however, the dubious reassurance, "I'm not going to marry this guy. This is just about sex."

> "Why, I can smile,
> and murder while I smile"
>
> . . . *Henry VI, Part Three*
> Act III, Scene ii

Although Kimberly may not have wanted into a new marriage, she desperately wanted out of the old one. An ominous sign of that desperation was a bizarre conversation she had with a co-worker at Holy Cross Hospital. Kenneth Burges

was a surgical technologist at Holy Cross Hospital, who had come to work there at about the same time that Kimberly had in 1995. He had, coincidentally, been convicted of welfare fraud in Virginia about twelve years earlier and may have seemed to Kimberly a promising recruit for skullduggery.

At sometime during the month of December, 1997, he was standing in the back hall just outside the women's locker room. As his back was turned to her, Kimberly said, "Ken, I want to talk to you." Without warning, she blurted out that she wanted him to kill her husband. He wheeled around, thinking that it had to be some sort of a joke. When he saw that she was deadly serious, he immediately said that he would not get involved in anything like that and tried to convince her that she was experiencing an overreaction to marital ennui. She nonetheless went on to ask if he knew "somebody that would kill her husband." She mentioned, moreover, the figure of $50,000 as the contract price. After it became clear that Ken Burges had no intention of getting involved, Kimberly urged him to "forget about it" and not to tell anyone else about their conversation.

Even as he declined the assassin's role, Kenneth Burges may nonetheless have planted a deadly seed. As an apparently embarrassed reaction to his initial astonishment, he made the flippant remark, "You work in the operating room . . . You could just put him to sleep."

Whether planted by Kenneth Burges or not, the seed grew. So did Kimberly's apparent compulsion to share her budding *mens rea* with anyone who would listen. In a New Year's Eve restaurant conversation with her friend and former neighbor Theresa Armstrong, Kimberly first described how she was "very angry and upset with the relationship" between her and her husband; then announced that she was asking him for a divorce; and, in a "very upset" state, concluded "that she had even been thinking of different ways to kill him." At one point during that conversation, Theresa Armstrong asked Kimberly, "What would you get out of it?" Ms. Armstrong described Kimberly's response, "She said, well, the insurance

money, so her and Anna can live their life the way they wanted, the way that she wanted to live her life." Ms. Armstrong stated that that snippet of conversation came just after Kimberly had mentioned killing Steven. Other evidence showed that from two separate life insurance policies on Steven Hricko, Kimberly Hricko, as beneficiary, stood to receive as much as $450,000.

Another confidant, on almost a daily basis through January and early February, was Jennifer Gowen, Kimberly's co-worker at both Holy Gross and Suburban Hospitals and Brad Winkler's cousin. After sharing with Jennifer "quite a lot of details about [her] intimate contact" with Brad and about how "very happy [she] was about what was going on with Brad," Kimberly further revealed that, since November, "she had had sex with Steve once and that it made her want to throw up." The marriage was obviously in trouble.

In succeeding conversations with Jennifer, Kimberly's revelations escalated from her being "interested in getting a divorce from Steve" to revealing "that she would like to kill him." In their first conversation "about killing Steve," Kimberly pointed out that one obvious disadvantage to traveling the divorce route would be that Steven might obtain custody of their daughter, Anna, or that, at best, "he would try to turn Anna against her":

> The conversation started with *Kim saying that Steve would be better off dead,* that we had talked about divorce but ... she said that he would be nothing without her and Anna and that, that if they got a divorce that he would try to turn Anna against her or to keep her. And that *he didn't really have very much of a life outside of that marriage anyway, and that he would be better off dead.*

(Emphasis supplied).

In a subsequent conversation, Kimberly pointed out a second disadvantage to asking for a divorce. She acknowledged that it would be unwise for her to tell her husband "about Brad" because "maybe he would get depressed or angry enough to kill himself" and "that if he did that, then they

couldn't collect the insurance because, I guess, it would be a suicide."

As discussion then became more detailed "about a way in which she would kill Steve," Kimberly first made mention of the drug Sustinalcolene*:

We had a discussion about a case history where a woman had injected some children with Sustinalcolene and that that *was a muscle relaxing anesthesia agent* and that, that *it would go untraced.* So that was that conversation that we had.

(Emphasis supplied). Jennifer Gowen further testified that Sustinalcolene was something regularly used by anesthesiologists in the operating room and that both she and Kimberly had ready access to it:

Q: As a surgical technician, if you wanted to have access to it, could you?

A: Oh, yeah, yes. Easily.

Although her resolve was hardening and her plan of action crystallizing, Kimberly still desperately needed moral support. She constantly sought reassurance as to Jennifer's "being there for her":

Kim wanted me to support her. She mentioned to me that her brother was someone who supported her and that *he would support her even if she killed someone* and she was asking me for support. And used those words many, many times.

Q: Did she ask you if you would support her under those circumstances?

A: She did not ask me that directly. However, *she did tell me that if I killed someone that she would support me.*

(Emphasis supplied). Jennifer Gowen also recalled that at sometime in January or February,

---

* There are apparently two accepted alternative spellings of the drug: "sustinalcolene" and "succinylcholine." The transcript uses the former spelling. So shall we.

Kimberly told me that *"if I could kill Steve and get away with it, I would do it tomorrow."* (Emphasis supplied).

### "The game's afoot!"
### . . . *Henry V*
### Act III, Scene i

As of Friday, January 30, Kimberly's intended course of action had become sure. At about 7:30 that evening, she initially talked by telephone to her girlhood friend from State College, Rachel McCoy, then living in Baltimore. Rachel then went out to dinner with a friend. When Rachel subsequently returned to her home at 9:30, there were five or six progressively more frantic messages from Kimberly on her answering machine:

They were gradually sounding more panicky and they just said call me as soon as you get in. I really need to talk to you. Please, please call me. I just really need to talk to you. Call me as soon as you get in.

Rachel immediately telephoned Kimberly, who implored her to come down to Laurel as soon as she could get there:

She said, "Rachel, you need to come down here now. I need you. Do you remember when I saved you in State College? I need you. You have to come here now." And I said give me fifteen minutes to let the dog out and I'm on my way.

### "O murderous slumber!"
### . . . *Julius Caesar*
### Act IV, Scene iii

Rachel arrived at Kimberly's between 11 and 11:30 P.M. Kimberly had been drinking and was very distraught:

She said, she was talking more about how it would be easier if Steve were dead and she told me that *she had a plan on how to do it where she wouldn't get caught.*

Q: Did she tell the plan to you?

A: Yes.

Q: Tell the ladies and gentlemen of the jury what she told you.

A: She told me that *she could get a drug that would paralyze Steve, that would stop his breathing and then she would set the curtains on fire with a candle or a cigar and that he would die of smoke inhalation in a fire and nobody would know.*

(Emphasis supplied).

Rachel McCoy attempted to dissuade Kimberly from committing murder. She testified that she "tried to poke holes in the story" but that Kimberly "had answers for everything." Rachel urged her to consider the alternative of divorce, but to no avail:

Q: Did you try to tell her about the option of divorce?

A: Yup, *I said* that to her a number of times. *Why don't you just get a divorce?* And *she seemed to think that this would be easier.*

(Emphasis supplied). Rachel raised the question of the effect of her father's death on Anna, again to no avail:

I also said what about Anna? You know she needs a father, and *she told me that Anna would be better off without her father.*

(Emphasis supplied).

Apparently, the only variation between Kimberly's plan of January 30 and its ultimate consummation on February 14 was the *situs* of the planned murder and staged "accidental" fire. As of January 30, that *situs* was to be the Hricko home in Laurel. Rachel McCoy warned Kimberly about the risks, once more to no avail:

I tried to say . . . what if your house burns to the ground, your brand new house? What if your neighbor's house catches on fire?

. . .

She told me that the house wouldn't burn down because *there's always neighbors up in that neighborhood* and *they would see the fire before the house burned and call the fire department.*

(Emphasis supplied).

Rachel probed Kimberly about the accessibility of the lethal drug, about its traceability, and about the method of delivery. Again, Kimberly had all the answers:

*She told me that she could get the drug at work very easily, that it was in every hallway or every OR;* that they used it for trauma victims to stop their breathing so they could put a tube in their throat to put them on oxygen, so it was right there. . . .

Q: Did she, when she discussed with you the drug, *did she talk about its ability to be traced?*

A: Yeah. *She told me that it wasn't traceable in the blood.*

Q: [Did] *she mention at all how she would give it to him?*

A: *She would inject it in a muscle.*

(Emphasis supplied).

Rachel McCoy ultimately ensured that no crime would be committed on the night of January 30–31. At about 1:30 A.M., Kimberly went upstairs ostensibly "to use the bathroom" but "didn't come back right away." Rachel went upstairs and found Kimberly "standing in the bedroom" where "Steve was asleep." Rachel had not realized that Steven was even at home that night. She further described the scene:

Steve was sleeping on the opposite side of the bed and she was just standing there staring, on the other side, staring at him with her arms down at her sides, just standing there. And I just told her to come back downstairs.

After persuading Kimberly to come downstairs, Rachel calmed her down, got her to stop crying, and persuaded her "that she needed to go to bed and go to sleep." A few minutes later, Kimberly "did go upstairs and go to sleep." Rachel waited for another twenty minutes to make certain that the immediate crisis had passed and then left for Baltimore at approximately

2 A.M. She spoke by telephone with Kimberly early the next morning and received an ambiguous response to her inquiry:

Q: Did you ask her anything about the plan that she told you about?

A: Yes. I asked her was she really going to do this and she said I don't know what I'm going to do, Rachel.

That was her last communication with Kimberly before the fateful events of St. Valentine's Day. Her testimony contained one other item of note. In the nine years she had known Steven Hricko, she had never known him to smoke.

**"O true apothecary!
Thy drugs are quick"**

*... **Romeo and Juliet***
**Act V, Scene iii**

Three separate expert witnesses—1) Dr. David Fowler, the Deputy Chief Medical Examiner for the State of Maryland; 2) Marc LeBeau, a forensic chemist and toxicologist with the FBI Laboratory in Washington, D.C.; and 3) Dr. Timothy Wex, the anesthesiologist at Holy Cross Hospital—testified as to the effects and the characteristics of the drug Sustinalcolene. It is extremely dangerous, extremely fast-acting, and ultimately untraceable.

The FBI toxicologist testified that Sustinalcolene "is a very dangerous fast-acting muscle relaxant" that is "typically administered in a clinical setting in a hospital." "It's very dangerous ... because ... you stop breathing." The "typical administration of this drug in the hospital would require that you be on some sort of a life support so that your body will still be able to breathe." In such a setting, it is closely monitored. Mr. LeBeau also testified that Sustinalcolene can take effect within five seconds of being administered intravenously and within less than a minute of being administered intramuscularly. He pointed out that the body's natural defenses almost immediately break Sustinalcolene down into two

component parts that are found naturally in the body, so that "within a few minutes you may not be able to detect Sustinalcolene in a blood specimen. It happens that quickly."

Dr. Fowler testified as to the potentially lethal effect of Sustinalcolene and to the speed with which it acts:

The other substance which concerned me was Sustinalcolene. It's only found in operating rooms. *It's a drug which causes very, very rapid paralysis of all skeletal muscles which involves also the chest muscles. It's been documented in fact to stop the heart for a few seconds after being given.* But that's kind of uncommon. It acts within seconds if it's given intravenously and usually will actually begin to wear off within two to four minutes.

(Emphasis supplied).

Dr. Wex, the anesthesiologist at Holy Cross Hospital, not only confirmed the characteristics of Sustinalcolene described by the other experts but elaborated on its effect on breathing:

Q: When a patient is placed or when Sustinalcolene is placed into a patient, how does the patient breathe then?

A: It depends on the anesthesiologist to breathe for you. A patient will not breathe themselves. The anesthesiologist will have to establish an airway one way or another. You either have to establish an airway by putting this tube down through your mouth, down into your windpipe and breathing for you or we can mask you with a mask and a bag and mask that you would have to have somebody breathe for you.

Q: Some sort of artificial ventilation would have to be introduced?

A: Exactly.

He further pointed out that Sustinalcolene is "not inventoried as closely as narcotic drugs." It is "routinely kept in the operating rooms or available in the operating rooms for the anesthesiologist."

"Oh, what a tangled web we weave,
When first we practice to deceive!"

... Sir Walter Scott
*The Lay of the Last Minstrel*
Canto VI, Stanza 17

The frantic meeting with Rachel McCoy had taken place on January 30. At sometime within the fortnight, the venue for Steven Hricko's temporarily prorogued "Appointment in Samara" shifted from Laurel to St. Michael's.

The last weeks of the Hricko marriage were filled with false hope in the one and false witness in the other. Ostensibly, they mutually committed themselves to an effort at reconciliation. Steven genuinely gave himself to the effort. For Kimberly, it was a charade. She described to Theresa Armstrong how Steven was going to counseling and was making an effort to be both more communicative and more affectionate:

> After she asked Steve for a divorce in January, Steve did make a lot of effort on his part, to where he wrote her this beautiful lovely letter that she read to me over the phone, and it was beautiful and Steve was going to counseling.

She also described to Theresa Armstrong her reaction to the effort: "He made her sick to her stomach."

Kimberly also shared with Rachel McCoy the effort being made by Steven and her reaction to it:

> We talked about he had ... started seeing a counselor and that ... he was talking more, being more outgoing like in their relationship and, but that *he was talking to her all the time and that was driving her crazy.* He wanted to talk to her all the time and talk about their feelings.

(Emphasis supplied).

In a conversation with Norma Walz, Kimberly indicated that Steven had gone into counseling at her suggestion in order "to turn himself around":

She told me that she had asked Steve for a divorce and that he had broken down and cried and begged her for a second chance. She told me that he had canceled a business trip the following Monday so he could get in to [see] a counselor, get in to [see] a doctor to get a referral to a counselor. She said that she gave him a week to see if he could get in to [see] a doctor and at least show that he was trying to turn himself around.

Her reaction to the turnaround was less than laudatory:

She said that ... *"he's smothering me and following me around the house like a puppy dog."*

(Emphasis supplied).

In late January and early February, Kimberly was in daily telephone conversation with Jennifer Gowen. She informed Jennifer of the fact that Steven had "started some counseling" and of how he had "started to make changes." Her description, however, of her own reaction to those changes revealed how the changes were an exercise in futility:

She told me ... her reaction or what *she said* about them was *that they made her sick and that he suffocated her and was stifling her and following her around all the time and cuddling up to her real close at night so that she felt like she couldn't breathe.* And wanting to know where she was going or what she was doing. And maybe giving her phone calls that she wasn't used to getting from him just to say "Hi."

(Emphasis supplied).

The getaway weekend on Valentine's Day was the idea of Mike Miller. At the end of January, Steven Hricko had called his friend and indicated that he "was looking for somewhere to go with Kim to plan a romantic evening" and wanted any suggestions that Mike or Maureen Miller might have. Mike Miller informed Steven about the Valentine's Day getaway weekend at Harbourtowne with the dinner theater. Steven was enthusiastic and had Mike Miller make the necessary reservations. Kimberly acquiesced in the plans for Valen-

tine's Day. Brad Winkler, incidentally, was due to be out of town on that weekend on an official assignment.

As February 14 drew closer, the juxtaposition of respective attitudes toward the impending Valentine's Day getaway is stark pathos. On February 9, Steven committed his hopes to his journal:

> Life at home is improving and *I am looking forward to Valentine's weekend at Harbortowne with Kim.* ... She called twice today and said "I love you" without [my] saying it first. I was very happy.... Kim and I have not made love yet and I want to but I will wait as long as it takes. I love her.... I believe I know what being in love really is. We have been married 9 years but *I feel like we just started dating.*

(Emphasis supplied).

On February 13, the night before she and Steven were to leave for St. Michael's, Kimberly, by contrast, made a trip to the house that Brad Winkler shared with his aunt. She wanted to leave her Valentine's Day gifts to him in his bedroom. The note accompanying the gifts read:

> Brad,
>
> I really wanted to give you all these gifts in person but I guess the Pentagon had a different idea. I am so proud of what you do so I'll just go on missing you. Have a nice weekend at home, baby. I look forward to seeing you soon. Happy Valentine's Day, sir. I love you so very much.
>
> Hugs and Kisses,
>
> Kim

On that same evening before the departure for St. Michael's, Kimberly spent two hours in her kitchen with Theresa Armstrong. Ms. Armstrong recalled:

> [S]he told me that ... *Steven made plans to go to a resort and to see a play.* And they weren't leaving until the next day.
>
> Q: ... [D]id she say whether or not she was looking forward to this?

A: No, *she was not looking forward to it.*

(Emphasis supplied).

The prospects of success for the romantic "getaway" weekend were dim. How dim was not yet apparent.

> **"What masques, what dances shall we have,**
> **To wear away this long age of three hours**
> **Between our aftersupper and our bedtime?"**

> ... *A Midsummer Night's Dream*
> **Act V, Scene i**

Steven and Kimberly arrived at Harbourtowne at about 3 P.M. on February 14 and were checked into Cottage 506. On their arrival, they were presented with a bottle of champagne. At approximately 7 P.M., they went to the dining room and to the dinner-theater production of "The Bride Who Cried." Steven and Kimberly left the dinner theater and returned to their cottage together at between 10 and 10:30 P.M. Kimberly Hricko walked into the lobby of the resort alone at approximately 1:20 A.M. and reported that her room was on fire. The real-life drama in this case requires filling the gap of that "long ... three hours" between the "aftersupper" in the dining room and the "bedtime" in the cottage. Kimberly Hricko is the only living witness to that interlude and her account was suspiciously flawed.

It was Elaine Phillips, the Banquet Manager who was also serving at the time as the Night Duty Manager, who received the report from Kimberly that her room was on fire. Elaine Phillips's cousin Philip Parker, along with other members of their family, was also standing in the lobby when Kimberly reported the room fire. After Elaine Phillips checked the register to determine the room number, she and Philip Parker ran out of the front door, across a parking lot, and toward Cottage 506, registered to the Hrickos. Cottage 506 is in Building 500, described as a villa, consisting of six cottage

hotel rooms. The door to Cottage Suite 506, which was on a porch shared with cottages 504 and 505, was locked.

Philip Parker ran around to a back porch from which he could observe, through a glass door, smoke in room 506. He ultimately was able to open the sliding door through which he had observed human feet and legs. Crawling into the smoke-filled room, he found the body of Steven Hricko lying on its back between two twin beds. With help from Elaine Phillips, Philip Parker ultimately was able to drag the body onto the back porch. Steven Hricko was already dead when dragged from the room. His body, clad in a tee-shirt and pajama pants, was badly burned from the mid-chest area upward, including his upraised left arm.

What was obviously called for was some explanation from Kimberly Hricko as to where she had been and what she had been doing between leaving the dining room at approximately 10:30 P.M. and reporting a room fire to Elaine Phillips at approximately 1:20 A.M.

**"Explain a thing
Till all men doubt it"**

. . . **Alexander Pope**
*The Dunciad,* **Book 4**

Kimberly's fullest accounts of the missing three hours were those given to Maryland State Police Trooper Clay Hartness, in the company of Father Paul Jennings, at approximately 2:30 A.M. and then, a slightly more detailed version, to Maryland State Police Trooper Keith Elzey at approximately 5 A.M. She did not testify at her trial. She told the troopers that on leaving the dinner theater, she and Steven had purchased four bottles of beer from the hotel bar and gone back to their room. She recalled seeing the end of a movie called "Tommy Boy" and then watching the late evening news come on. Despite a pre-Valentine's Day covenant with her husband that they would refrain from having sex during the weekend

getaway, he began pressuring her for sexual intercourse and an argument ensued between them that lasted for approximately ten minutes. Because she did not wish to continue the argument, she grabbed her purse and the car keys and left the room.

She described how she then left the Harbourtowne resort and drove toward Easton to visit her friends Mike and Maureen Miller. She became lost, however, and had to stop and ask several persons for directions. She stated that she was not familiar with Easton and could not find the Millers' home. She stated that she could not even find Route 50 and then, abandoning the intended visit, had to ask further directions even to get back to St. Michael's. She arrived back at Harbourtowne shortly after 1 A.M.

She discovered at that point that she had forgotten to take with her the plastic key card for the door to room 506, which was locked. She walked around to the deck area at the back of the room, remembering that the sliding glass door at the rear of the unit had been opened earlier that evening. As she pushed it further open, she was met by a wall of thick smoke. She reached inside to feel for a light switch but with no success. She then ran to the front of the unit and began knocking on a number of other doors and screaming for help but received no response. At that point, she jumped into her car and drove to the main lobby, using her cell phone to call 911 while on the way. In the lobby, she advised Elaine Phillips that her room was on fire.

Did Kimberly's attempted explanation become part of the proof of her guilt? It most assuredly did. It is a forensic fact of life that an exculpatory effort that is disbelieved thereby becomes highly inculpatory. In prosecutorial jargon, it is called the "false exculpatory." In the algebra of production burdens, it goes to prove consciousness of guilt. Kimberly's attempted explanation fell into that category in several regards. Indeed, it began to unravel even as it began.

There was first the improbability of getting lost—not just getting lost *per se* but getting lost for two hours. Easton is no more than a fifteen-minute drive from St. Michael's, a thirty-

minute round trip. Two hours could have seemed to the jury an inordinately long time to be lost in so relatively confined an area. Kimberly had been—indeed, had herself driven—to the Easton home of Mike and Maureen Miller just ten weeks earlier. In terms of knowing the neighborhood, Kimberly's brother, Michael Wolfe, also lived in Easton, just two blocks away from the Millers. Kimberly was very close to her brother Michael, for it was Michael whom she asked to have called and who drove immediately to the Harbourtowne resort in the pre-dawn hours of February 15. It was of Michael that she spoke when she told Jennifer Gowen that her brother would support her if she killed someone.

If lost, why not call the Millers for directions? As an alternative, why not call her brother Michael? Kimberly had and knew she had a cell phone with her in the car. It was operational, as she demonstrated at approximately 1:20 A.M. when she called 911. Kimberly, moreover, knew the Millers' number by heart. She recited it to Trooper Hartness who she asked to call Mike Miller for her at a little before 2 A.M. As Bonnie Parker said, she "rattled it off." By 8:30 A.M. on February 15, Maureen Miller had joined Kimberly at Harbourtowne. When Kimberly told her about "trying to find [her] house in Easton . . . for an hour, hour and a half," Maureen Miller asked the very question the jurors would have asked themselves and received an improbable answer:

> I asked her why she didn't call me and she says well it was too late. I didn't want to wake you up. And I said why didn't you call Michael? And she said that she was just driving around.

The incongruity of the response was not even subtle. Why, at a given hour, would one be unwilling to wake up with a phone call the very people one was fully intending to wake up by ringing the door bell?

Kimberly's explanation of the missing three hours also consistently referred to Steven's intoxication. She told Maureen Miller that Steven "had drank a lot" and "had gotten fairly drunk." Kimberly told Mike Miller that Steven was "sloppy drunk." She described to Trooper Elzey her noticing

that Steven, during dinner, "was consuming a heavy amount of alcohol." A Talbot County Assistant State's Attorney, who was seated at the same table with the Hrickos throughout dinner, on the other hand, testified that Steven had had one beer. The bartender who served drinks at the table said the people at that table basically "didn't drink." The bar bill for the Hrickos collectively was $5.51, the price of two beers. The autopsy on Steven Hricko's body showed a blood alcohol content of 0.00.

At a follow-up interview on February 23, Trooper Elzey pressed Kimberly more closely with respect to Steven's drinking. She said that "Steven drank a bottle of champagne" on his arrival at the resort and that at the dinner table he "was drinking heavily," both wine and beer. She stated that Steven purchased more beer to take back to the room. When confronted with the autopsy report and the blood alcohol content of 0.00, Kimberly had no explanation:

> After that I asked her would you please tell me the amount of alcohol that your husband consumed that night on February the 14th, 15th. She advised me that he was drinking heavily that night. At that time I confronted her with the Medical Examiner toxicologist's report information indicating 0.00 blood alcohol contents in her husband's body. At that time she just stared for a second and said, I don't understand that. And I don't understand that. I said well could you please explain to me if your husband was drinking this amount of alcohol why didn't it register? Again she just said, I don't understand why. I don't understand.

In instance after instance, Kimberly's attempted explanations simply generated greater and greater disbelief.

> **"The best laid schemes o' mice and men**
> **Gang aft agley;**
> **An' lea'e us nought but grief and pain."**

> ... **Robert Burns**
> *To A Mouse,* **Stanza 7**

Even before telling a story rent with incongruities, the well laid scheme of Kimberly had begun going "agley" within minutes of going operational. The first suspicious circumstance was the inappropriateness of her behavior on discovering a fire in her room. A reasonable person, returning to her hotel room with the ostensible purpose of going to bed and suddenly realizing that her husband was trapped in a burning room, would not have displayed the remarkable composure exhibited by Kimberly. The building block, of which room 506 was a part, contained five other units, all of which were occupied. Where one would have anticipated screams to pierce the very fabric of the night, none of the other occupants of Building 500 was even awakened.

Kimberly's arrival at the lobby of the resort was even more bizarre. As Elaine Phillips testified, there was neither excitement nor, for the longest time, even an indication that her husband was still inside the burning room:

A: A woman walked into the lobby. She had a cell phone up to her ear. It was turned upside down. She was just listening into it. She walked over to us, my cousin and me. *She said, "I need to speak to someone who works here."* My cousin, who was about a step ahead of me, kind of directed her to me. *I asked her, may I help you and she said, "My room is on fire."*

Q: What did you do then?

A: We immediately began to ask her her room number, where is her room and she wasn't answering. We then said what is your name and she said Hricko. I knew that it was an odd spelling of the name so I spelled it out to the night auditor and he gave me the room number of 506 and I called 911. I was on the phone to 911 when my cousin was questioning her, is she all right, is everything okay? Was she all right?

Q: This is all right here in the lobby?

A: Yes.

Q:  Okay.

A:  And *they asked her was there anyone else in the room and she said, "My husband."* 911 at that time said that the call had already been called in.

(Emphasis supplied).

Elaine Phillips elaborated on Kimberly's restrained demeanor as she reported the fire:

> She was, she walked in the lobby and there was no evidence, I mean there was nothing, that she was upset. She was just walking into the lobby. She was very calm. Even when she said, "There's a fire in my room," we were more excited, I know. We were asking her and trying to get the room number and we were all very excited and nervous as to what was happening. And I remember her just standing very, very calm and just being very calm.

The other key witness to Kimberly's preternatural calm was Philip Parker. He described the initial approach of her car:

> We noticed a car pull up to the front of the lobby. We noticed a young lady get out of the car and walk into the lobby of the hotel.

She did not screech to a halt and dash into the lobby with the lights on and the motor running:

> I noticed when the car came up that ... the ignition was turned off and the car was turned off and the lights also turned off.

Philip Parker gave his version of Kimberly's report of the fire. Coming eerily late in that report, the fact that her husband was in the burning room seemed almost an afterthought:

> You could tell she was agitated or was upset about something. What it was at the time, we didn't know. *She had walked in the door and she asked for an employee of Harbourtowne.*

Q: Who did she ask?

A: She asked the group of us, me, Elaine and my fiancee. Elaine spoke up and said that she was an employee of Harbourtowne and what was the problem. You could tell by her agitation that there was something wrong. *As soon as Elaine said she was an employee, she informed us that her room was possibly on fire.*

Q: Then what happened?

A: Elaine kind of got a little upset herself and tried to find out what room she was in. She stated that she didn't know what room she was in. She then told Elaine what her last name was. Elaine went to the books. By this time my mom had come out of the coat room. At the beginning of this, she had walked out of the coat room. She was already behind the desk and they looked *into the record I guess to* find out what room she was staying at. At this time, too, I don't remember if it was me or Tracy or Elaine, but *someone had asked her if there was anybody in the room that was on fire and she said that she thought that her husband could be in there.*

(Emphasis supplied). As a tell-tale reaction, Kimberly displayed a *sang-froid* about her husband's fate that was macabre, unless, of course, she already knew that the time of response was not of the essence.

Philip Parker gave his characterization of Kimberly's almost icy demeanor:

Q: Let's go back to the hotel lobby. The woman who came in and told you all about the fire. What was her demeanor?

A: It was actually really calm. *When she walked in at the time, she mentioned nothing about the fire.* As I said, *all she did was ask for an employee at Harbourtowne.* As soon as Elaine indicated that she was an employee of Harbourtowne, she then said that she, you know, after Elaine had questioned her about what the problem was, she

then said that there was a fire in her room. And once again, she seemed quite calm to me.

(Emphasis supplied).

**"Foul deeds will rise,**
**Though all the earth o'erwhelm them to men's eyes."**

... *Hamlet*
**Act I, Scene ii**

Even for the most hardened professional, it is difficult, following the commission of a crime, not to exhibit anxiety about detection. Kimberly's behavior after Steven's death betrayed a number of sometimes arguable but sometimes telling indications of consciousness of guilt.

As she stood outside Cottage 506 with Bonnie Parker and later back in Bonnie Parker's room, her primary initial response was, "I want to go see his body." That was, to be sure, an ambiguous response, but it could be interpreted as revealing a concern as to whether the charring of the victim's skin adequately obliterated a puncture mark made by a needle. Such a reading takes on greater plausibility in conjunction with Kimberly's later concern to learn the autopsy results and her strong desire that Steven's body be cremated.

It was one week after St. Valentine's Day that Kimberly called Trooper Elzey in Easton because she "wanted an update on the Medical Examiner's report." At a time when the assumed cause of death was still a very straightforward case of smoke inhalation from an accidental room fire, Kimberly's curiosity might have raised an eyebrow: "What is there to be curious about?" In hindsight, of course, her curiosity as to what the autopsy revealed takes on far greater significance.

So too it was with Kimberly's desire that Steven's body be cremated. On the Monday after Steven's death, Maureen Miller offered to help Kimberly with the funeral arrange-

ments. In all respects but one, Kimberly was largely indifferent to the arrangements:

> We went through the list and *she pretty much didn't care about what the specifics were of the arrangements.* She was very noncommittal. *The only thing that she was definite on was that she wanted the body cremated.* She was very adamant on that because she said that's what Steven had said he had wanted.

(Emphasis supplied).

On the day after Steven's death, Kimberly traveled to the home of his parents in Pennsylvania. In discussions with Steven's sister, Jennifer Hricko, about the funeral, Kimberly's only firm resolve was with respect to the cremation. As Jennifer Hricko testified:

> [S]he let it be known that it was fine with her if we took care of it all except that the cremation was decided on and that any other aspects she didn't have a strong opinion on but that it was up to us.

A day later, Jennifer Hricko picked up Kimberly to take her to the funeral home. She described the anxiety exhibited by Kimberly because "there had been some hold up on releasing the body for cremation":

> She explained when she was in the car that she was too anxious. She didn't feel that she was up to driving herself. *She was pretty anxious.* In fact when I picked her up at the curb she was, *she appeared to be restless. She was walking up and down, pacing, and in an anxious manner.* She got in the car. *She affirmed that she felt too anxious and shaky to drive herself* and that is why she had wanted someone to drive her to the funeral home. And *the reason being* she explained was *that there had been a hold up on releasing the body for cremation* and that she was instructed to come to the funeral home to, I believe maybe sign some papers to have that, the go ahead, to fax, they would have to fax that signature down I guess somewhere in Baltimore or down in Maryland. And *she was concerned. She didn't quite understand why.* She felt she had taken

care of all those arrangements prior to coming up to Pennsylvania.

(Emphasis supplied).

Why the great concern over cremation? Self-evidently, the destruction of yet undetected evidence of poisoning in the body of the victim would be an end much to be desired and any unexpected "hitch" in that aspect of the concealment, a cause for significant alarm.[1]

A week after Steven's death, a conversation Kimberly had with Maureen Miller would also have sent up a red flag. After coming to Easton for a follow-up interview by Trooper Elzey, Kimberly spent the night with Mike and Maureen Miller. The following morning, Kimberly made a special request of Maureen Miller. She asked her to contact Jennifer Gowen, Theresa Armstrong, and Rachel McCoy by phone and to discover what, if anything, any of those three friends had revealed to the police. Maureen Miller testified:

> She asked me to call them and find out what statements they had made to the police.

To seek to learn what friends have been saying to the police is not normal behavior for one who has recently but innocently been widowed.

Several conversations that Kimberly had with her friend Theresa Armstrong shortly after being taken into custody also betrayed a consciousness of guilt. In one of those conversations, Kimberly and Theresa Armstrong were discussing which of Kimberly's friends "had given some information to the police." Kimberly indicated that she was sure it had been Rachel McCoy. The conversation then turned to the question of how much Rachel McCoy knew:

> A: I asked her, *did you tell Rachel exactly what you were going to do?*

---

**1.** *See, e.g., Jones v. State,* 716 S.W.2d 142 (Tex.1986), a case where a victim's body was exhumed eight months after her death and a gas chromatography mass spectrometry test revealed in the victim's tissues the theretofore undetected presence of Sustinalcolene. Kimberly incurred no such risk in this case.

Q: *What was her answer?*

A: *Yes.*

Q: She answered you yes?

A: Yes.

(Emphasis supplied). In another telephone conversation between Kimberly and Theresa Armstrong, Ms. Armstrong asked Kimberly "how she felt about what happened in Harbourtowne the weekend of Valentine's Day." The answer was:

[S]he told me that she was feeling a lot of remorse.

A conversation Kimberly had shortly after her arrest with Jennifer Gowen was even more revealing. Jennifer was visiting Kimberly in jail and their conversation turned to the subject of the insurance money on Steven's life:

Q: Did you have any questions to her about money?

A: In the jail?

Q: Yes.

A: *Kim said that I don't care what anyone says, it wasn't for the money.*

(Emphasis supplied). That was obviously a revelation as to her motivation and the rhetorical question that needed no answering was, **"What wasn't for the money?"**

In her second interview with Trooper Elzey on February 23, Kimberly teetered on the brink of a confession. Trooper Elzey confronted her with his knowledge about her affair with Brad Winkler. Although subsequently acknowledging it, Kimberly was initially stunned:

At that time she never said nothing. She just stared. I advised her that ... we knew of her affair that she was having with Brad Winkler. At that time she still never said nothing. She just sat there and stared. And then she finally placed her face in her hands and looked up and said, yes.

She was then confronted with the autopsy report showing that Steven had a blood alcohol content of 0.00. Her reaction was just to stare for a second and then protest that she did not understand how that could be. She was finally confronted

with the fact that the autopsy report revealed that "there was no carbon monoxide or soot found in her husband's body." At that point, she appeared ready to confess:

> And again she stared and didn't say nothing and then she stared some more and she said I don't understand why. I don't understand. At that time, she hesitated and never said nothing and then she kind of bowed her face down towards her hands and started crying. She continued crying. I said to her, Kimberly, please tell me what happened that night. And she continued crying. She gets up out of her chair, walks over and sat in another chair where she continued crying. Again I said please tell me what happened that night. *Kimberly said to me, if I tell you what happened, can I go home tonight and see my daughter.* I stated to her, Kimberly, please just tell me the truth and what happened the night your husband died. *Kimberly looked up and stated to me I want to tell you but I want to see my daughter first.* I told Kimberly, I said, Kimberly, I will make arrangements for you to see your daughter. She hesitated, sat there, looked up again and *Kimberly stated to me, I really want to tell you the truth, but can I still go home?*

(Emphasis supplied). The statement "I really want to tell you the truth" clearly implied that she had not earlier told Trooper Elzey the truth. The Maryland law enforcement establishment is apparently not as relentless as popular legend would sometimes have us believe, for at that point Kimberly, obviously ready to break, was allowed to go home.

**"The proof of the pudding
Is in the eating"**

**... *Don Quixote*
Part I, Book IV,
Ch. 10**

At this point in our recital of the evidence, it may well be the case that testimony from several State experts as to 1)

the nature of the fire in Room 506 and 2) the literal cause of Steven Hricko's death is already superfluous, at least in terms of generating a *prima facie* case. Kimberly's appellate contentions, however, are obsessed with that expert testimony. Two of her contentions, focusing on the expert testimony, go to the legal sufficiency of the evidence to prove 1) the *corpus delicti* of arson and 2) the *corpus delicti* of murder. The third contention is an evidentiary one, concerning the admissibility of the expert opinion of the Medical Examiner.

Kimberly would like to look at the evidence supporting the *corpus delicti* of arson in a vacuum, as if only the physical examination of the fire scene by the Fire Marshal had pertinence and as if all of the other evidence in this case, heretofore discussed in elaborate detail, had no bearing whatsoever on the question. Kimberly would like to look at the evidence supporting the *corpus delicti* of murder in a separate vacuum, as if only the physical examination of Steven Hricko's body by the Medical Examiner had pertinence and as if all of the other evidence in this case, heretofore discussed in elaborate detail, had no bearing whatsoever on that question.

Unfortunately from the defense point of view, that is not the case. The State's case on all charges is an intertwined totality. As we engage in a discussion of Kimberly's contentions, one overarching observation is in order. As we evaluate the evidence of arson, all of the evidence of murder, indicating that the fire itself may simply have been part of a murder scheme, will also be considered because of the bearing it has on the question of arson. Conversely, as we evaluate the evidence of murder, all of the evidence of arson indicating that the fire was deliberately set in an effort to conceal the true cause of death, will also be considered as it bears on the *corpus delicti* of murder. The evidence of arson and the evidence of murder are not in mutually exclusive watertight compartments. In evaluating both legal sufficiency claims, moreover, Kimberly will not have the benefit of hypothetically prevailing on her third and evidentiary contention. In determining the legal sufficiency issues, we will look to the expert opinion as to the cause of death that came into evidence, not

simply to the evidence that Kimberly agrees should have come in. One appellate contention may not "bootstrap" another.

> "Those that with haste will make a mighty fire
> Begin it with weak straws"
>
> ... *Julius Caesar*
> Act I, Scene iii

With respect to the purely physical phenomenon of the fire in Room 506, the key State's expert witness was Deputy Michael Mulligan of the Maryland State Fire Marshal's Office. At the time the first police officers and fire-fighters entered Room 506, they confirmed that the prostrate body of Steven Hricko had been lying on the floor, between and parallel with two twin beds. Two badly burned pillows had been beneath Steven Hricko's head.

Deputy Mulligan testified that the point of origin of the fire was those two pillows. He testified that intense heat from the flaming pillows caused the fire to spread to an adjoining bedspread and that that, in turn, caused the mattress on one of the beds to be burned completely through. There was also flame impingement on the headboard of that bed and on the wall adjacent to the burned bed. The carpet in various places around that bed also showed burning. The body of Steven Hricko was badly charred from the chest area upward to the top of his head, including his upraised left arm. Deputy Mulligan was of the opinion that the fire had burned for between five and fifteen minutes but then burned itself out when the oxygen level in the room fell below the point where it could sustain the fire.

A significant aspect of the fire scene investigation involved the process of elimination. Deputy Mulligan testified that 1) lightning could be ruled out as a cause of the fire, 2) spontaneous combustion could be ruled out, and 3) the fire did not have an electrical origin. Two possibilities remained. One was careless smoking, which we will discuss more fully in a mo-

ment. The other possibility was a fireplace in the room. Deputy Mulligan "eliminated" that as a possible source of the fire:

> [T]he only source of fuel in there ... was the store bought easy-light log. When I got there, it was still warm but it had been out obviously ... for some time and you had the crust of ash there with the paper match still eviden[tly] stuck into the ashes. I don't believe it's possible for a spark to have generated from that log and come out the doors and travel that distance to those pillows and ignited those pillows. It's physically impossible.

As we shall discuss in a moment, he also eliminated "careless smoking" as the possible source of the fire. There is no dispute but that the expert testimony of Deputy Mulligan was that all of these aforementioned possibilities could be eliminated as the cause of the fire. Those respective eliminations were all received in evidence. Judge Horne, however, would not allow Deputy Mulligan to offer his ultimate opinion that the fire was "incendiary" in nature. He felt that the process of elimination employed by Deputy Mulligan, though itself admissible, was not adequate to serve as a predicate for the ultimate opinion that the fire had been "incendiary." He ruled:

> In this case the expert, Mr. Mulligan, has attempted to prove that this was an incendiary set fire by the use of negative evidence saying it wasn't this, it wasn't that, and it wasn't this. I can't think of anything else and so therefore, it must have been incendiary. It couldn't be accidental. It couldn't be spontaneous. Had to be incendiary.... I don't know that we have an exhaustive list from Mr. Mulligan of all the potential accidental or spontaneous causes of a fire.... I don't think that his negatives are sufficiently complete to permit the introduction of his opinion as to the incendiary nature of the fire.... The Court finds in this case that there has not been the proper foundation and accordingly without such proper foundation, the testimony of Mr. Mulligan as to the type of ... the fire incendiary, accidental or spontaneous will not be permitted to be intro-

duced into evidence and the jury will be instructed to disregard the opinion that he expressed.

In arguing that the State's evidence was not legally sufficient to sustain the conviction for first-degree arson, Kimberly relies exclusively on that evidentiary ruling by Judge Horne. She blithely equates the inadequacy of the predicate for Deputy Mulligan's ultimate expert opinion with the inadequacy of the predicate for permitting the charge of arson to be submitted to the jury. As expressed in her appellate brief, her argument draws no distinction between Deputy Mulligan's opinion and the State's total case:

> *In the case at bar, the evidence was equally insufficient. Mulligan* was able to identify the area of origin of the fire, but *was prohibited from rendering an opinion that the fire was incendiary* in origin. There was no accelerant detected, and there were several potential accidental sources for the fire. *The state therefore failed to overcome the presumption that the fire was accidental* in origin, *and the evidence was insufficient for a conviction on the charge of arson.*

(Emphasis supplied).

The appellant's brief doggedly confuses what was before Deputy Mulligan with what was before the jury:

> It is significant to this issue that the trial court found an insufficient factual basis for Mr. Mulligan to render his opinion. *It is difficult to conceive that there could have been insufficient evidence for an expert to render an opinion that a fire was incendiary, but sufficient evidence for the jury to make that same finding beyond a reasonable doubt.*

(Emphasis supplied). The jury, of course, was not limited to a physical examination of the fire scene and was not asked to render an expert opinion based upon such a physical examination.

Kimberly's argument is a leap of faith that falls far short of the mark. There was, of course, bounteous evidence of arson presented to the jury above and beyond the physical examina-

tion of the fire scene by Deputy Mulligan. Judge Horne was fully aware of the distinction, just as he was aware of the requirement of *Bollinger v. State,* 208 Md. 298, 304–07, 117 A.2d 913 (1955), that the burning must be the result of a wilful act and not the product of natural or accidental causes. At the end of the first day of the trial, Judge Horne ruled that Deputy Mulligan's physical examination of the fire scene and his resort to the process of elimination did not represent an adequate predicate to permit him to offer an expert opinion that the fire was incendiary in nature. At the end of the third day of trial, by contrast, Judge Horne denied the defense motion for a judgment of acquittal with respect to arson and ruled that the totality of the evidence was enough to justify submitting the charge to the jury. A day later, at the end of the entire case, he made a similar ruling. We now turn attention to the extrinsic evidence of arson.

The bridge between Deputy Mulligan's physical examination of the fire scene and the greater evidence of arson beyond began with his elimination of "careless smoking" as a possible cause of the fire. Kimberly had told Trooper Elzey that Steven smoked when he was drinking. There was found in the room, under a pillow on the masonry hearth, an opened eight-pack of Backwoods cigars. A carelessly smoked Backwoods Cigar was immediately the prime suspect. Deputy Mulligan, over the course of a number of days of testing, went to heroic lengths in an effort to see if a Backwoods Cigar could, indeed, have ignited the room fire. His conclusion was that it was simply not possible:

> The other possibility that was my biggest concern would be careless smoking because we located a package of Backwoods Cigars, an eight pack of Backwoods Cigars under a pillow that was on the masonry hearth. To eliminate careless smoking as a possible cause, I went to Rite–Aid in town here [and bought a package of Backwoods Cigars] and Harbourtowne gave me a pillow and a pillowcase similar to the ones in . . . the rooms there. I took it to Salisbury burn tower where the firemen in Salisbury do their drills and for an hour and a half in the presence of George Kinhart, I lit

these Backwoods Cigars.... [O]riginally the first one I had, I laid it on top of the pillow and the cigar would try to roll off but we put it back on the pillow and made sure that it stayed on there. The first time I did it, I left the cigar on there until it burned out. It didn't even make a mark on the pillowcase. But as the cigar would burn down and you got it down to like a butt kind of thing, there would be more exposure from the ash on the cigar and I started to get a char on the pillowcase but I could never get it to burn. At that point I started putting a crease in the pillow, folding the pillow over and lighting the cigar and putting it in this crease and waiting until the cigar completely burned out and I, after I saw it not smoking for awhile I'd touch it with my finger to make sure it was completely out. Light the cigar again, put it back in there. I repeated this over and over, never took more than 10 or 13 minutes for the cigar to go completely out. And in fact I took the pillowcase off of the pillow and I exposed the, the pillow itself, the lining of the pillow without a pillowcase on it directly to the ash, again propping up the cigar ash to get a more direct contact on it, to insulate it, to try to do whatever I could do, to encourage it to burn. And at no time could I get it to burn. The last test I did just, quite frankly I was getting [nauseated] from the cigars. I took three of them and lit them and put them and propped them up where all the ashes were down relatively close to each other and it still wouldn't burn.

On a separate occasion, he went to the testing facility and attempted to see if a Backwoods cigar applied to the bedspread could result in a fire. The result again was negative. He attempted to apply a burning Backwoods cigar to the carpet and again could not produce a fire. The result was the same with the bed itself and with Steven's jacket. He concluded that the Backwoods cigars could not possibly have caused the fire in Room 506.

To that point, as part of the physical examination done by Deputy Mulligan, the Backwoods cigars were merely negative evidence, something eliminated as a possible source of the fire. The Backwoods cigars, however, were to take on far greater

significance as affirmative proof of both arson and murder. It would ultimately be shown that the cigars were the center-piece of an elaborate ruse carefully staged by Kimberly to make it appear that Steven had died in an accidental fire caused by careless smoking. The setting of a false trail is strong affirmative evidence of guilt.

Kimberly had told Trooper Elzey that Steven smoked when he drank. Mike Miller, on the other hand, who had known Steven all of his life, testified unequivocally that Steven did not smoke:

Based upon your very lengthy association with Steven Hricko, are you familiar with some of his habits?

A: Yes, I am.

Q: Did Steven Hricko to your knowledge smoke, either cigarettes or cigars?

A: No, he did not.

Jeffrey McMackin had been a co-worker of Steven. He stated that Steven was a non-smoker and elaborated on that observation. There were several occasions when he had so-cialized with Steven where Steven had refused cigars. On one company-sponsored dinner in Charlotte, North Carolina, the company was treating the two of them to dinner "at a very nice restaurant" and wine was served with the meal. "Very high priced cigars, very nice cigars" were then offered. Jef-frey McMackin encouraged Steven, "This is a good cigar. You don't even have to pay for it." Steven steadfastly declined.

Kimberly's friend, Rachel McCoy, also knew Steven well and knew that he was a non-smoker:

Q: Know him for a long period of time?

A: About nine years.

Q: Ever know him to smoke?

A: Never.

Steven's sister, Jennifer Hricko, testified that she had fre-quently socialized with her brother and knew that he was a non-smoker:

Q: Have you ever known your brother to smoke?

A:   I can literally say I've never seen a pipe, cigarette, or cigar in his mouth.

Room 506, into which Kimberly and Steven Hricko checked, was, moreover, a non-smoking room.   If Steven Hricko did not smoke cigars or anything else, how then does one account for the presence of the package of Backwoods cigars in the room where he was murdered?   Within several weeks of his death, those cigars were accounted for by a painstakingly thorough investigation by the Special Investigation Support Unit of the Maryland State Police.

After investigating approximately twenty-five stores in the Laurel area to see if they carried Backwoods cigars, the State Police ascertained that the cigars in question had come from the Astor Liquor Store in the Laurel Shopping Center, within several miles of the Hrickos' residence.   Kimberly Hricko had been a customer there on more than one occasion and a clerk, identifying her photograph, was able to remember that on an afternoon in late January or early February, it was Kimberly Hricko herself who purchased a package of Backwoods cigars. A document examiner with the Maryland State Police was further able to ascertain that the $2.49 marking label on the packet of Backwoods cigars found in Room 506 had been made by the Monarch marking gun used by the Astor Liquor Store in Laurel.   It was Kimberly who bought the cigars found at the murder scene.

There was evidence to show that in staging what was designed to look like an accidental fire resulting from careless cigar smoking, Kimberly had 1) lied to the police about her husband's drinking, 2) lied to the police about her husband's smoking, and 3) planted the cigars that were supposed to look like the instrumentality of the accidental fire.   The ruse of an accidental fire had a dual purpose.   Primarily, it was to serve as the apparent cause of Steven's death or, if all went well, it was to be the actual cause of Steven's death.   Secondarily, it was to obliterate, by charring the skin, any puncture mark left by the needle through which poison was injected into his body.

With respect to its primary purpose, the ruse failed utterly. The Medical Examiner's report on Steven's body revealed that there was no carbon monoxide and no soot in his lungs or in any other part of his body. It was conclusively established that he was already dead before the fire could have had any effect upon him.

As a part of the predicate from which the jury could reasonably infer that the fire itself was incendiary rather than accidental in nature, moreover, the defense conveniently ignores that the most conclusive support for such an inference was that the fire was an integral part of a larger murder scheme. The expert opinion of the Medical Examiner was that the manner of Steven Hricko's death was "homicide" and that the cause of death was "probable poisoning." Without rehashing all of the evidence we have recounted at length throughout this opinion, the evidence was overwhelming that Kimberly Hricko was the homicidal agent. In terms of the linkage between the poisoning and the fire, Kimberly had laid out her plan of action with precision to Rachel McCoy just two weeks before she put that plan into operation. Rachel McCoy recounted Kimberly's intended course of action:

> She told me that *she could get a drug that would paralyze Steve,* that would stop his breathing and then *she would set the curtains on fire with* a candle or *a cigar* and that he would die of smoke inhalation in a fire and nobody would know.

(Emphasis supplied). After the crimes had been completed, Kimberly confirmed to Theresa Armstrong that she had told Rachel McCoy "exactly what [she was] going to do." The only thing that went awry with the plan was that instead of paralyzing Steven so that he would die of smoke inhalation, Kimberly gave him too much Sustinalcolene and he died immediately, before having the opportunity to inhale any smoke.

The evidence abundantly supported the conviction for arson in the first degree, *corpus delicti* and criminal agency alike.

262

"Murder, though it have no tongue,
Will speak."

*... Hamlet*
Act II, Scene ii

In contending that the evidence was not legally sufficient to establish the *corpus delicti* of criminal homicide, Kimberly's argument closely shadows her argument with respect to the *corpus delicti* of arson. She chooses to look at the *post mortem* examination in a vacuum and argues that if it does not, within its four corners, reveal a trace of Sustinalcolene or any other specific poison, the jury is thereby precluded from considering poisoning as the modality of death. She would deny the jury the prerogative of looking at mountains of other evidence, extrinsic to the *post mortem* examination.

As an abstract proposition, Kimberly's arguments with respect to both murder and arson rest on the unfounded assumption that proof of the *corpus delicti* and proof of criminal agency are mutually exclusive and that, in the context of this case, the multitudinous proofs that Kimberly was the murderess may not contribute to proving the *corpus delicti* of murder. All one need do, however, is place oneself in the shoes of a reasonable and inquisitive juror to realize that Kimberly's argument is absurdly self-refuting. Do the extrinsic facts of 1) Kimberly's frequently expressed desire to kill her husband, 2) her specifically detailed intent to poison her husband, 3) her ready access to the poison, 4) her flawed attempt to disguise the poisoning as an accidental death in a fire, and 5) her quasi-admission that she had done exactly what she intended to do help us to conclude that the cause of the otherwise mysterious death was "probable poisoning"? Of course they do! They were of similar help to the jury.

Once again, Kimberly disingenuously conflates the *post-mortem* examination with the total State's case, ignoring the fact that the latter may consist of far more than the former. By analogy, if proof of the death itself may be

circumstantial, *a fortiori,* so may proof of the cause of death. Proof of death, of course, may be circumstantial. Popular mythology to the contrary notwithstanding, it is settled law that it is permissible to prove the *corpus delicti* of homicide even without a corpse. In such cases, there is self-evidently no *post-mortem* examination at all, but that has never been an impediment to a conviction.

The first Maryland case to grapple with so exotic a plot line was *Lemons v. State,* 49 Md.App. 467, 433 A.2d 1179 (1981). Lemons had boasted to a girlfriend, in lurid detail, of how "he had killed a woman ... in one of the bedrooms" and had "taken her and chopped the bones up in the cellar and thrown them in the trash." Based almost exclusively on that apparent burst of braggadocio, Lemons was convicted of the first-degree murder of one Debbie Kelly, a coworker of his at the White Coffee Pot some nine or ten years earlier. The only evidence corroborating the existence of a *corpus delicti* was the testimony of the manager of the White Coffee Pot, who remembered that Debbie had once worked there, had not returned to work one day, and had not been heard from since.

Although this Court held that there was not, on the facts of that case, sufficient evidence as to the existence of the *corpus delicti* to corroborate the defendant's confession, it nonetheless recognized, in the abstract, the feasibility of the State's proving a homicide even in the absence of a body:

> In every Maryland case reported thus far involving the corroboration rule in the context of a homicide, the victim's body had been recovered and there was other independent evidence, either direct or circumstantial, to suggest that the death was not the result of accident or suicide. *This,* of course, *does not imply that the inability to produce a body is an insuperable obstacle, in itself, to the obtention and sustention of a murder conviction.*

49 Md.App. at 486, 433 A.2d 1179 (citations omitted; emphasis supplied). The fact of death can be proved like any other fact, by circumstantial evidence as well as by direct evidence.

In *Hurley v. State,* 60 Md.App. 539, 483 A.2d 1298 (1984), this Court affirmed a conviction for manslaughter in a case where the victim's body was never discovered. The appellant there sought to rely on "the State's failure to disclose 'one shred of evidence as to the presence of the victim's body in spite of thousands of man hours of police work' and on the lack of any scientific or forensic proof of foul play." 60 Md.App. at 549, 483 A.2d 1298. In rejecting that contention and affirming the conviction, Judge Alpert wrote for this Court, 60 Md.App. at 550–51, 483 A.2d 1298:

> Our decision in *Lemons* and here—that *failure to recover the victim's body is not fatal to the State's case in a homicide prosecution*—is in accord with other states that have addressed a similar situation. As the California Court of Appeals succinctly stated: *"The fact that a murderer may successfully dispose of the body of the victim does not entitle him to acquittal.* That is one form of success for which society has no reward." We concur with this view and with the admonition espoused by the Appellate Division of New Jersey's Superior Court when it stated that *"successful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt."*

(Citation omitted; emphasis supplied).

By parity of reasoning, if "successful concealment ... of the victim's body should not preclude prosecution of his ... killer," neither should successful concealment of the fatal toxic agent within the victim's body preclude the prosecution of his killer. *See also Tu v. State,* 97 Md.App. 486, 489–90, 631 A.2d 110 (1993), a case where the defendant was convicted of second-degree murder even though there were no witnesses to the murder and the victim's body was never found. The State's theory of the case was that the appellant hid the body in a couch and then had the couch hauled to a county landfill where it was so compacted with tons of other trash that it was subsequently impossible to find either the couch or the body.

In this case, the report of the *post-mortem* examination and the trial testimony of Dr. David Fowler, who conducted that examination, complemented and fully corroborated all of the State's other evidence showing that Kimberly Hricko poisoned her husband with Sustinalcolene. The two tributaries of proof converged into a single and inexorable stream of guilt.

Dr. Fowler explained that Steven Hricko's body was initially brought to his office simply "to confirm whether or not Steven had in fact died in a fire." The examination, however, unexpectedly revealed that he had not. Dr. Fowler testified as to that conclusion:

> That particular result in fact ruled out death by fire. In fact, the only conclusion from that particular result is that *the individual was dead before the fire actually reached him.* This man did not breathe any of the products of combustion of that fire. *He was dead, not breathing at the time of the fire.*

(Emphasis supplied).

All of the normal causes for a natural death were also eliminated. With respect to Steven Hricko's heart, Dr. Fowler stated:

> I found that he had essentially a normal cardiovascular system. I identified no abnormalities in his coronary arteries, his valves were normal. The heart muscle appeared normal.

Dr. Fowler further described:

> It was normal liver and kidney, and gallbladder. The alimentary [tract] which is the stomach, small, large bowel, etc., were all normal. The genital urinary [tract] which is the kidneys and genitalia, I saw no abnormalities there. Spleen was normal. Endocrine system was normal. Muscle development, he was a very large, fit, well muscled person. I did not see any abnormalities there. Obviously, I don't dissect out every single joint. I'm merely doing an external examination of most of the joints. And the brain itself, that was entirely normal as well. So *I saw* at the

time I'd finished the autopsy, as I said *no physical reason that I could identify for this man to have died.*

(Emphasis supplied). The follow-up microscopic examination of Steven Hricko's organs showed no abnormality or apparent cause of death.

Significantly, the report from the toxicology laboratory showed that "there was no alcohol present in his blood stream." That finding was repeatedly rechecked and reconfirmed. Because of the reports that Steven Hricko had been drinking, Dr. Fowler had a second specimen of blood tested as well as the urine and the liver. The results never budged:

So now I've asked them to run it on three separate other samples. So this time we know that the samples that I sent up have been tested for alcohol eight times because again they will run it in duplicate on two separate machines. And the result is that we did not detect any alcohol. Not even a low level. There was no alcohol according to the toxicology laboratory present in any of the specimens that they analyzed.

Q: And so that would be a reading of the lack of alcohol at the time of death of Steven Hricko, is that correct?

A: Absolutely correct.

Q: Just for clarification and explanation purposes, if a person dies while there is alcohol in their system, in their blood, will that alcohol remain in the blood after death or will it continue to dissipate?

A: It will remain in the body after death and in fact after a given period it will start to increase, not disappear.

Dr. Fowler quite properly contrasted his physical findings at that time with the contradictory reports from the death scene, reports emanating primarily from Kimberly Hricko:

*My focus then became one of very heightened suspicion. The evidence that I have now obtained* in the way of the cause of death, the alcohol levels and everything else *are totally contrary to the actual scene evidence* ... nothing is fitting together. *Everything is contradicting ... everything else* from that point of view. *I have a person who's*

*allegedly drunk but he's not drunk. I have a person who allegedly dies because of a fire. He did not die because of the fire. He was dead before the fire.* And there is no physical reason for him to have died. I now also have no drug levels. I don't have heroin or cocaine or anything else that I can blame it on. I don't have an overdose of medications. I have nothing from the obvious chemical analysis to explain this person's death.

(Emphasis supplied).

Dr. Fowler then eliminated most poisons and operating room anesthetics because their presence can be detected in the blood and there were no traces of them. His focus turned to Sustinalcolene:

*The other substance which concerned me was Sustinalcolene. It's only found in operating rooms.* It's a drug which causes very, very rapid paralysis of all skeletal muscles which involves also the chest muscles. It's [even] been documented in fact to stop the heart for a few seconds after being given. But that's kind of uncommon. It acts within seconds if it's given intravenously and usually will actually begin to wear off within two to four minutes. So it obviously has a very specific use in the operating room.

Q: Can it be given intramuscularly and still have an effect?

A: Yes, it can be given intramuscularly.

(Emphasis supplied).

Because the "delivery method" for Sustinalcolene would be through injection with a hypodermic syringe, Dr. Fowler examined Steven Hricko's skin for a puncture mark but explained the difficulty he encountered:

[T]he needles are so sharp and so fine that we don't see needle marks on a huge number of our people, even after exhaustive examination of the outside of the body. But there was a further complication in this particular case in that *he had actually suffered burning to part of his body. And when a part of the body is charred, if there's a needle mark in that particular area, I have absolutely no way of spotting a tiny, fine, little ... puncture.* I mean we're

looking at something which is so small, less than pin size. And one of the hallmarks of a needle mark, say in a drug addict, is that it's going to have a little bit of bruising around it. Now *if something such as Succinylcholine was used which caused death within three or four minutes, once the heart is stopped, the blood pressure stops. Once the blood pressure stops, you're not going to get bruising at any injury site.* And so I'm now limited not to finding a bruise at a needle mark, but I'm actually limited to finding the actual naked needle mark itself which is worse than the proverbial haystack.

(Emphasis supplied).

The autopsy itself and the subsequent toxicology tests did not reveal the presence of Sustinalcolene. Dr. Fowler explained why they would not be expected to do so:

Sustinalcolene *usually wears off within about four minutes.* And so this is a substance which our body will destroy in about four minutes.

Q: And that wears off naturally?

A: Wears off naturally.

. . .

Q: *Are there any side effects that one can detect in an autopsy?* Side effects of Sustinalcolene?

A: *No.*

(Emphasis supplied).

After vigorous legal argument, Judge Horne ruled that Dr. Fowler would be permitted to give his expert opinion as to the manner and cause of Steven Hricko's death. He stated with "a reasonable degree of scientific certainty" that the manner of death was "homicide" and as to the cause of death:

In my opinion, he died of probable poisoning although we could not confirm the agent.

The autopsy report itself, also listing the same manner and cause of death, was then received in evidence.

Although in a separate contention Kimberly challenges the admissibility of Dr. Fowler's expert opinion that the cause of

death was "probable poisoning," that opinion is nonetheless part of the indubitable evidence as we assess its legal sufficiency. We hold that the evidence was legally sufficient to establish the *corpus delicti* of murder.

With respect to the legal sufficiency of the evidence to support the murder conviction generally, moreover, the decision of this Court in *Snyder v. State,* 104 Md.App. 533, 657 A.2d 342 (1995), is hauntingly instructive. That case also involved a St. Valentine's Day murder, that of a wife by a husband after a history of domestic strife. There was no direct evidence of the husband's criminal agency, but the encircling web of circumstantial evidence was inescapable. In ruling the evidence legally sufficient, we stated:

> [A]ppellant's *discovery of the body,* his *conduct on the day of the murder, statements he made before and after the murder, and* his *conduct subsequent to the murder, were sufficient to establish* his *guilt.*

104 Md.App. at 551, 657 A.2d 342 (emphasis supplied). There are echoes as we hold to the same effect here.

> **"When you have eliminated the impossible,**
> **Whatever remains, however improbable,**
> **Must be the truth."**
>
> . . . **Sir Arthur Conan Doyle**
> *The Sign of the Four,* **Ch. 6**

Kimberly's final contention is that Judge Horne abused his discretion in permitting Dr. Fowler to offer his expert opinion that the cause of death was "probable poisoning." The argument rests on the supposition that the evidence from the *post-mortem* examination alone could not support such an opinion. That is by no means the case. The physical evidence in this case included 1) the examination of the body made by Dr. Fowler, including the prominent fact that Steven Hricko's body was badly burned after he was already dead; 2) extensive laboratory test results; and 3) the toxicology reports.

The totality of that physical examination eliminated all reasonably foreseeable natural causes for Steven Hricko's death. Dr. Fowler's examination also eliminated all external trauma to the body.

Kimberly is understandably reluctant to acknowledge the probative force that may result from a careful process of elimination. We do not share that reluctance. After all reasonably foreseeable natural causes of death had been carefully and methodically eliminated and after all causes of death based on physical trauma to the body had been carefully and methodically eliminated, an experienced Medical Examiner, who had conducted over five thousand autopsies, stated with reasonable medical certainty that the cause of death was "probable poisoning." We cannot say, as a matter of law, that a Medical Examiner could never arrive at that expert opinion on the basis of a process of elimination as utilized in this case.

Kimberly, however, stubbornly relies on the fact that the autopsy itself showed no trace of Sustinalcolene as dispositive evidence that there was no Sustinalcolene. The testimony of various experts, however, was that Sustinalcolene generally leaves no trace. A negative, moreover, may sometimes have positive significance. Like the dog that did not bark in the night in Holmes's "Silver Blaze," the utter absence of evidence may proclaim guilt as loudly as any affirmative clue. Although it does, to be sure, partake of the paradox of *Catch 22*, the best proof of a substance that leaves no trace is the complete lack of any trace.

■ We have not yet finally resolved Kimberly's evidentiary contention, however, for it has an elusive chameleon-like quality. Just when we think we've pinned it down, it takes another form. At times, Kimberly seems to argue that Dr. Fowler's medical opinion was based on **too little.** At other times, she seems to argue that Dr. Fowler's medical opinion was based on **too much.** The **too little** argument—the absence of affirmative traces of poison in the *post-mortem* examination—we have now disposed of. The **too much** argument is that Dr. Fowler may improperly have taken into

consideration extrinsic evidence from sources other than the *post-mortem* examination itself. In her brief, Kimberly surmises:

> It is possible that the trial court felt that there was sufficient non-medical evidence upon which Dr. Fowler could rely for his opinion. However, such reasoning would ignore the patent inappropriateness of allowing expert testimony where the jury is capable of evaluating the evidence without such assistance.

(Emphasis supplied).

The standard of appellate review of such evidentiary rulings have been clearly stated by *Sippio v. State,* 350 Md. 633, 648, 714 A.2d 864 (1998):

> Under the well-established Maryland common law of evidence, *it is within the sound discretion of the trial court to determine the admissibility of expert testimony.* The Maryland Rules of Evidence, adopted by this Court in 1994, did not limit that discretion. *See* Maryland Rule 5–702. *A trial court's ruling either admitting or excluding such testimony "will seldom constitute a ground for reversal."*

(Internal citations omitted; emphasis supplied).

In ruling that Dr. Fowler would be permitted to give his opinion as to both the manner of death and the cause of death, Judge Horne properly looked to the three requirements set out by *Sippio,* 350 Md. at 649, 714 A.2d 864:

> In ascertaining whether the expert testimony will be helpful to the trier of fact, a trial court must instead determine whether certain requirements have been satisfied: (1) the proposed witness must be qualified to testify as an expert; (2) the subject matter about which the witness will testify must be appropriate for expert testimony; and (3) *there must be a legally sufficient factual basis to support the expert's testimony.*

(Emphasis supplied). *And see* Maryland Rule 5–702. The satisfaction of the first two criteria was not disputed. The only issue before us is whether there was "a legally sufficient factual basis to support [Dr. Fowler's] testimony."

Kimberly's contention is that evidence extrinsic to the post-mortem examination itself may not contribute to that "factual basis." In her appellate brief, she argues as she did before Judge Horne:

[W]hat the medical examiner bases that upon ... is really the extrinsic evidence obtained as a result of the statements in this case and other portions of the investigations.... So *what we have, ... is ...* a medical doctor giving *a ... medical opinion based* not upon the science, not upon the medicine, but rather *upon the other evidence in this case, principally the statements allegedly made by my client.*

(Emphasis supplied).

Kimberly's conjecture is that Dr. Fowler must have relied on extrinsic evidence in forming his opinion:

Due to the lack of medical or scientific evidence indicating a cause of death, *Dr. Fowler necessarily relied upon non-medical evidence for his opinion as to the cause of death.* Because Dr. Fowler's opinion was based solely upon information provided to him by the police (*i.e.,* Ms. Hricko's admissions) it had no probative value and improperly invaded the province of the jury.

(Emphasis supplied).

Although our review of Dr. Fowler's testimony does not suggest that he relied, even in part, on extrinsic evidence in arriving at his conclusion, the short answer is that there would be no legal problem even if that had been the case. Md.Code, Health–General Article, Sect. 5–309(b) expressly mandates that when the medical examiner is investigating the manner and cause of a suspicious death, "the police or sheriff immediately shall" give the medical examiner "the known facts concerning the time, place, manner, and circumstances of the death."

In the *Sippio* case itself the critical issue was whether there was a proper "factual basis" to permit the medical examiner to offer his expert opinion that the manner of death was "homicide" rather than "accident." In addition to performing the autopsy, the medical examiner "had received information from

Detective Steinhice prior to performing the autopsy as to the circumstances surrounding the shooting." That information, moreover, was considered by the medical examiner in arriving at his ultimate opinion:

> On recross examination, Dr. Smialek testified:
>
> [Dr. Smialek]: *I had information that [Sippio] had told the police that he had shot Ms. Branch.*
>
> [Defense Counsel]: And did that aid you in coming up with the conclusion that it was not a natural, accidental, suicidal or undetermined cause of death?
>
> [Dr. Smialek]: *I considered that information together with the physical findings of the body,* the fact that the wound was not a typical contact gunshot wound such as I would see in a suicide.

350 Md. at 650, 714 A.2d 864 (emphasis supplied).

The Court of Appeals placed its *imprimatur* on the use of that broader evidentiary base, as opposed to limited reliance on the autopsy in a vacuum, for a medical examiner's expert opinion as to the manner or cause of death:

> [T]here was a sufficient factual basis to support Dr. Smia-lek's testimony. *A factual basis for expert testimony may arise from a number of sources, such as* facts obtained from the expert's first-hand knowledge, *facts obtained from the testimony of others,* and facts related to an expert through the use of hypothetical questions. Here, *Dr. Smialek's examination of Branch, in conjunction with his statutorily-mandated discussion with Detective Steinhice concerning the circumstances of the shooting, provided Dr. Smialek with a sufficient factual basis from which to testify as to manner of death.* His finding of homicide was, thus, not the result of conjecture or guess. Rather, *it was supported by medical facts determined by Dr. Smialek himself as well as relevant information obtained from a reliable police source.*

350 Md. at 653, 714 A.2d 864 (internal citations omitted; emphasis supplied).

In one final grasping at a straw, Kimberly argues that because 1) Dr. Fowler **MAY HAVE** relied in part on extrinsic

evidence and 2) such extrinsic evidence, **IF RELIED ON,** was evidence readily comprehensible by the jury, the expert opinion thereby invaded the province of the jury. The argument is so speculative in several regards and without merit in so many regards that responding to it is like trying to catch a moonbeam in your hand.

Though much more could be said, it is enough to note that the jury could have been helped by the expert opinion of the experienced post-mortem examiner, based on the careful process of elimination of all reasonably foreseeable alternatives, that the cause of death was "probable poisoning." As *Sippio* observed:

> *The trial court need not consider whether the trier of fact could possibly decide the issue without the expert testimony. Nor must the subject of the expert testimony be so far beyond the level of skill and comprehension of the average layperson that the trier of fact would have no understanding of the subject matter without the expert's testimony.*

350 Md. at 649, 714 A.2d 864 (internal citations omitted; emphasis supplied).

In ruling that there was an adequate factual basis for Dr. Fowler to render an expert opinion as to the cause of death, Judge Horne did not abuse his discretion. Kimberly's third and final contention will not fly.

**"Thus even-handed justice**
**Commends the ingredients of our poisoned chalice**
**To our own lips"**

*... Macbeth*
**Act I, Scene vii**

We hereby affirm the convictions for a crime that can only be described as 'twas once described by the ghost of Old King Hamlet:

"Murder most foul,
But this, most foul, strange, and unnatural."[2]

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*