897 A.2d 884

**Kira TARACHANSKAYA**

v.

**Mikhail VOLODARSKY.**

**No. 1453, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

May 2, 2006.

---

588

590

Nicole E. Ames, John C. Broderick (Hodes, Ulman, Pessin & Katz, PA, on brief), Towson, for appellant.

Panel DAVIS, ADKINS, and KRAUSER, JJ.

DAVIS, J.

Kira Tarachanskaya, appellant, files this appeal challenging the Judgment Order and reasons stated in the Memorandum Opinion and Order rendered by the Circuit Court for Baltimore County, in which the court awarded sole legal and physical custody to appellant of parties' minor daughter, Greta, and ordered that the child's father, appellee Mikhail Volodarksy, have no visitation but could visit with his daughter in "a structured, therapeutic setting." Appellant presents the following questions for our review:

I. Based on the credibility and overwhelming weight of the evidence presented at trial, the Trial Court had reasonable grounds to believe that the child, Greta, had been sexually abused by her father and therefore did the Trial Court commit a reversible error of law by failing to make findings pursuant to Section 9–101 of the Family Law Article of the Maryland Annotated Code?

II. Did the Trial Court commit a reversible error of law by failing to specifically determine whether abuse was likely to occur if visitation rights were granted to the father?

III. Did the Trial Court commit a reversible error of law by ordering visitation between the minor child and her father without specifying the conditions that would suffi-

ciently assure the safety and the physiological, psychological, and emotional well-being of the child?

IV. Did the Trial Court commit a reversible error of law by considering testimony and evidence from prior hearings and/or proceedings as well as prior actions of the parties, not admitted as evidence at Trial, in rendering her findings and conclusions at Trial?

V. Did the Trial Court commit a reversible error of law by improperly delegating judicial authority to the child's therapist to determine the visitation parameters for the father and minor child?

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Appellant and appellee filed petitions in the circuit court with regard to custody and visitation of their daughter, Greta, age 7, born on January 7, 1999. The court conducted a trial on the merits on February 1–3, March 14 and 15 and May 10 of 2005 and heard testimony in reference to appellee's Motion for Change of Custody and appellant's Complaint for Modification of Visitation.

Appellant arrived in the United States in August of 1996 and separated from her husband, Alex Tarachanskaya, in November of 1997, claiming Tarachanskaya was abusive toward her and their son. In March of 1998, appellant and her son moved in with appellee, after which she became pregnant with Greta. Soon after Greta's birth in January of 1999, appellant reconciled with her husband. The Tarachanskaya household consisted of appellant, her husband, their son Arthur and Greta. As the trial judge explained, "[t]his case has been specially assigned to me since the first hearings in September 1999" and, the parties' "cross-petitions are the latest in [a] series of disputes between these parents that have spanned the life of their minor child."[2]

---

1. We incorporated portions of the circuit court's History of the Proceedings in our opinion.

2. In its Memorandum Opinion, the court recounted the early history of proceedings between the parties:

On March 15, 1999, [appellee] filed a Complaint for Custody and Visitation, alleging a denial of access and visitation. [Appellant] file [sic] a Counter–Complaint for custody, alleging patterns of abusive behavior. Both parties were represented by counsel, who reached an agreement for interim supervised visits pending trial on the merits. However, that agreement was honored more in the breach, as [appellant] resisted any contact between the father and the child.

The custody trial occurred on September 24, 27 and 30, 1999. Testimony at trial demonstrated that [appellant] was extremely protective of her child, who was then only nine months old. She was also very distrustful of [appellee], and evaded any efforts at contact, including her behavior in hiding even the birth of the child. While she expressed concerns that he lacked the parenting skills necessary to care for a young child, she was resistant even to brief periods of supervised contact. Further, she expressed the view that the child should not be allowed out of her care for any period beyond two to two and a half hours until she was at least eighteen months or more, and that overnight visits would not be appropriate until the child was at least two.

[Appellee] had no experience in caring for an infant, and had extremely limited contact with Greta as of the date of the trial. Starting in late July 1999, the parties agreed to a schedule for one hour visits, supervised by Christine Fluke from the Child Support Division. Ms. Fluke confirmed that [appellee] had limited parenting experience, but she also noted the need to extend his time with his child to really develop independent parenting skills. The parties clearly demonstrated no ability to co-parent. Accordingly, following the conclusion of the hearing, the Court awarded sole legal and physical custody of Greta to her mother. Visitation was increased to two-hour sessions, twice each week, at the father's apartment, with a designated relative or family friend present to facilitate the drop-off and to supervise the initial part of each visit. A 90–day review was set to consider possible increases in the access schedule. Both parties were also ordered to participate in Parenting Classes, and an interim Home Study and Visitation Assessment was requested from the Court's Family Support Services Division. Child support was also ordered.

The Home Study was completed on January 14, 2000. Notably, that report stated:

Based upon the tone of the interviews, [appellee and appellant] appear to be experiencing a significant level of conflict. Distrust and retaliation appeared to be emphasized as a feature of their conflict. The report also noted [appellant's] continued resistance to increasing the time of visitation unless supervised in the home of a relative. It also noted [appellee's] "lack of objectivity" in assessing his parenting strengths and weaknesses, and his resentment of efforts to unduly restrict or structure his time with his child. Overall, the report recommended a gradual increase in visitation, along with an enhanced parenting skills class for [appellee].

At the review hearing in January 2000, an agreement was eventually reached to increase the weekend visitation session to four hours through April 15, 2000, to expand to six hours through July 1, 2000,

The issue presented to the court that was the genesis of the custody and visitation petitions filed in May of 2002 involved cross-allegations of abuse concerning Greta. Appellee alleged that Greta had been sexually abused by Tarachanskaya, while appellant claimed appellee had sexually abused Greta. Appel-

---

and then to begin overnights on Fridays, to return on Saturday at noon. Before overnights could commence, [appellee] was required to complete parenting classes. The parties, through counsel, agreed to discuss and attempt to finalize a holiday visitation schedule.

In June 2000, [appellant] filed a Contempt Petition, based upon non-payment of child support. [Appellee] petitioned to reduce his support payments, based upon problems within his business. Following a hearing on August 24, 2000, [appellee] was found in contempt, arrears were assessed, and some minor adjustment in the support level was ordered.

On July 20, 2000, [appellee] filed a separate petition to change the child's last name to Volodarsky. This was not consolidated with the present case, and therefore was directed to a chambers judge. No notice of the requested change was even provided to the mother. Nevertheless, an Order granting the Petition for name change was entered on August 1, 2000. This caused a further rift in the already strained relationship between the parents.

Throughout the fall of 2000, the tensions between the parents escalated. [Appellant] complained that Greta returned from visits hungry, smelling of smoke, and with occasional bruises. On October 4, 2000, Greta returned from a visit with her father with a bruise on her thigh. The child was taken to Sinai Hospital for an examination of the bruise, causing a Child Protective Services referral for investigation. While that was pending, [appellant] refused to allow any visitation, resulting in a Contempt Petition filed by [appellee]. While the investigation was ongoing, the Court ordered interim supervised visitation.

A hearing was held on the visitation contempt and related physical abuse allegations on December 1, 2000. The Court found no evidence of physical abuse, and ordered visitation to resume immediately, with final disposition held in abeyance until December 18, 2000. Following an interim mediation session, the parties, through counsel, submitted a consent agreement reflecting a weekend and holiday visitation schedule, which was reduced to an Order on February 21, 2001[.]

Although visitation proceeded in accordance with that schedule, the relationship between the parties and the pattern of accusations and suspicion did not improve. On September 14, 2001, [appellee] filed a pro se Petition for an Ex Parte Protective Order, alleging physical abuse of Greta by Alex Tarachanskaya. (Case No. 03–C–01–09580). The Petition was denied by Judge Robert N. Dugan, based upon his finding of lack of a familial relationship between the parties.

lant had suspended all visitation between appellee and Greta at that time.

In its Memorandum Opinion, the court then explained:

Contempt proceedings occurred on June 27, 2002. By that time the Child Protective Services investigations of both sexual abuse referrals were complete. The report of abuse by Mr. Tarachanskaya was ruled out,[3] and that by [appellee] was deemed unsubstantiated.[4] Notably, the letter to [appellant] reporting these results stated: "It is my strong recommendation that Greta be appointed her own legal counsel. The repeated allegations of abuse and neglect being made by yourself and [appellee] are clearly not in the best interest of Greta."

Following a hearing On [sic] June 27, 2002, [appellant] was again found in contempt of the visitation order. However pending the modification hearings, overnight visits between [appellee] and Greta were temporarily suspended,

---

3. Md. Regs.Code tit. 07. § 02.07.12(C) (2006), promulgated under the authority of F.L. § 5-701, states:

C. Ruled Out Child Abuse. A finding of ruled out child abuse is appropriate if child abuse did not occur. A finding of ruled out may be based on credible evidence that:
(1) There was no physical or mental injury or, in the case of suspected sexual abuse, no sexual molestation or exploitation; ... (3) The individual identified as responsible for the injury or sexual molestation or exploitation was not the child's parent, caretaker, or household family member. . . .

4. Md. Regs.Code tit. 07. § 02.07.12(B) (2006) provides, in pertinent part:

B. Unsubstantiated Child Abuse. A finding of unsubstantiated child abuse is appropriate when there is insufficient evidence to support a finding of indicated or ruled out child abuse. A finding of unsubstantiated may be based, but is not required to be based, on the following:
(1) Insufficient evidence of a physical or mental injury, sexual molestation, or sexual exploitation;
(2) Insufficient evidence that the individual alleged to be responsible for the child abuse was a parent, caretaker, or household or family member;
(3) The lack of a credible account by the suspected victim or a witness;
(4) Insufficient evidence that the child's health or welfare was harmed or was at substantial risk of being harmed ...

and a female was required to be present at visits, in an effort to reduce the level of distrust and concern, and to eliminate the potential for unsubstantiated claims. A referral order for counseling services for the child was entered, along with a referral for psychiatric evaluations of both parents by the Office of the Court Psychiatrist.

A report of the psychiatric evaluations was forwarded to the Court on November 21, 2002. The evaluation noted there was nothing in [appellee's] history to question his fitness as a parent. Similarly, there was no evidence of significant psychopathology to warrant individualized treatment. The psychological assessment did identify slight depression, and somewhat obsessive qualities, noting [appellee] appeared quite guarded and helpless.

As to [appellant], the evaluation noted that she has "little insight into her part in the current situation. She sees all of the difficulties as related to [appellee]." The psychological report by Dr. Manne described her as " relatively manipulative" in order to get her own way, but also noted that she did not demonstrate any significant psychopathology. There was nothing to suggest that [appellant] was unfit, although the report did note that she "does appear to be manipulative to get her own way, particularly when she interprets a threat to her children."

Overall, the report of the Court Psychiatrist noted:

It is clear from the history that [appellant's] use of the Courts will continue. It is our opinion that this behavior is detrimental to the child. (For example, both parents are now videotaping their interactions with Greta to serve as "proof" of what is going on). Because of this, it is our recommendation that the child's attorney evaluate all claims made by either parent and decide if in fact the child's best interests are being compromised, at which point Court involvement would be appropriate.

The report further recommended joint counseling services for the parents.

While abuse issues were still being alleged, counsel for Greta attempted to obtain an independent assessment and counseling for the child. That process was complicated by the fact that Greta, then three, did not speak English. An interim custody and visitation arrangement was negotiated between the parties, through counsel, and confirmed on November 22, 2002. Pursuant to that agreement, overnight visitation for [appellee] was to resume, and the parents were to begin Joint Parenting counseling with Jewish Family Services. The parties agreed to stop taping their interactions with the child, and further agreed to enroll Greta in a pre-school program so she could begin to learn English by January 1, 2003. Trial was postponed until May 2003 to allow these services to begin, and to complete an evaluation of the child.

\* \* \*

[Appellant] appeared on the first day of trial without counsel. Following a chambers conference, and as trial was about to proceed, [appellant] left the building. Thus the trial proceeded in her absence. The Court heard testimony from Dr. Robert Snow, who had conducted an evaluation and counseling at the request of the child's counsel. The Court also received input from the child's counsel. Thereafter, custody and visitation were modified, by Order dated June 6, 2003, with legal custody awarded to [appellee]. Physical custody was to be split on a 4/3 schedule, alternating weeks, with a shared holiday schedule. Counseling for the parents was to be arranged through Dr. Snow.

Almost immediately after the modified custody Order was entered, [appellant] appeared in District Court for Baltimore County in Catonsville and filed an *Ex Parte* Domestic Violence Petition seeking relief on behalf of her daughter, based upon allegations of sexual abuse by [appellee]. A Temporary Protective Order was entered, and the matter was again referred to the Department of Social Services for investigation. Interim custody was awarded to [appellant] and a no contact order was entered by the District Court with respect to [appellee].

A Joint Motion was filed by the child's counsel and [appellee] to remove the domestic violence case to the Circuit Court, which was granted. The Protective Order was then also specially assigned to me, and was set for hearing. (Case No. 03–C–03–06567). Substitute counsel entered an appearance for [appellant] on June 13, 2003, and the Protective Order hearing was held on June 18, 2003. After hearing testimony from [appellant] and a witness, and from witnesses from the Child Protection Unit of the Baltimore County Department of Social Services and the Baltimore County Police Department, the Court denied the Protective Order.

Visitation continued in accordance with the established schedule until March 15, 2004. At that point, [appellant] filed another Petition for Relief from Domestic Violence, alleging sexual abuse of Greta by [appellee]. Although the child had been continuously represented by counsel since July 2002, and [appellee] also had counsel of record, the first notice to either was receipt of the Interim Protective Order signed by Judge Michael J. Finifter. Thereafter, these proceedings were again transferred to me. As with the June 2003 Protective Order proceedings, the abuse allegations were essentially the same allegations raised in the past. The significant difference, however, was that Greta was older, her English language skills had developed, and the disclosures had become much more graphic and detailed. The other significant difference was that [appellant's] new counsel had consulted with Joyanna Silberg, Ph.D. concerning his client's ongoing complaints of child sexual abuse.

... At counsel's request, she interviewed [appellant] and conducted a review of various reports and court documents. Based upon the information available to her, Dr. Silberg authored a report indicating that the question of whether Greta is a victim of ongoing abuse had not yet been successfully addressed. As Dr. Silberg stated:

[I]n my professional opinion based on years of involvement in cases like this, it is simply impossible to explain

the level of symptoms that Greta is suffering from, her repeated disclosures to multiple professionals and family members as documented in the records I reviewed, without being very very alarmed at the possibility that this child is seriously at risk of abuse with the current arrangement.

Accordingly, Dr. Silberg recommended an immediate cessation of visits with Mr. Volodarsky, psychotherapy for Greta, and a thorough reassessment of the sexual abuse allegations.

The Protective Order hearing was scheduled before me on March 29, 2004, at which point all parties, through counsel, agreed that Greta would commence with regular psychotherapy sessions with Dr. Snow, that Dr. Silberg would conduct a separate evaluation of the sexual abuse allegations, and that visitation would continue pursuant to the June 2003 Order.

At the initial assessment meeting with Greta, she made more graphic sexual disclosures. Greta also exhibited significant distress whenever in her father's presence, in sharp contrast to prior behavior. Thereafter, [appellant] sought to suspend all visitation, based upon the recommendation of Drs. Silberg and Snow, and that request was set for an emergency hearing. The day before that hearing, [appellee's] counsel agreed to suspend visitation voluntarily, based upon the recommendations of the therapists, until the sexual abuse investigation was completed. It was contemplated that the investigative process would be relatively brief.

Ultimately, Dr. Silberg completed her investigation and finalized a report dated July 24, 2004, which was circulated to parties and counsel shortly thereafter. That report detailed numerous, explicit disclosures by Greta of sexual abuse by her father and concluded that Greta is very frightened of her father. It also concluded that the nature and details of the child's disclosures were "so vivid and accurate that only real experience could produce these reports." Accordingly, Dr. Silberg recommended that Greta have no ongoing contact with her father, that she have

ongoing therapy, and that reunification occur only under a highly structured process to ensure that the child is and feels safe in his presence.

After receiving the report, the Court conducted a follow up hearing concerning interim visitation. As a result, Greta was placed temporarily in her mother's physical custody, with a requirement that she remain in regular, ongoing counseling. No visitation between Greta and her father was to occur, pending trial on the merits.

Dr. Silberg's report and conclusions concerning abuse were forwarded to the Baltimore County Department of Social Services in October 2004, prompting a new investigation by the Family Crimes Unit which assigned Rosalind Dizard, LCSW. Ms. Dizard had not been involved in any of the prior abuse investigations concerning these parties. Ms. Dizard conducted an investigation, including an unscheduled interview with the child at her school on Monday, October 25, 2004. Follow-up interviews were conducted with counsel and the parties. Ultimately, Ms. Dizard finalized a report dated January 4, 2005, in which she concluded that the allegations of sexual abuse by [appellee] were "ruled out" as defined in COMAR 07.02.07.12 to mean "there is no credible evidence of an incident involving sexual molestation or exploitation having occurred." Rather, Ms. Dizard concluded that "parental alienation is the primary dynamic within this family system and that it is more likely that she was not sexually abused by [appellee]."

The court heard evidence adduced at trial mainly from the evaluations and opinions of Dr. Silberg, Dr. Snow and Dizard, as well as testimony from appellee. Upon considering the evidence, the court found the following in its Memorandum Opinion:

It is difficult to reconcile the conflicting opinion of the experts. All are experienced and credible, and gave careful consideration to difficult evidence. Overall, the Court is persuaded that this child has been exposed to sexual behavior. The Court is not, however, convinced by a preponder-

ance of the evidence that Greta has been a victim of sexual abuse, or that her father has perpetrated sexual abuse.

This child has been enmeshed in high levels of parental conflict since the day she was born. Conflicting allegations of abuse, both physical and sexual, have been made by both parents. From the earliest assessments, professionals have noted the need to de-escalate the parental conflict and avoid immersing the child in loyalty conflicts, but that never occurred.

It is noteworthy in the history that the significant and detailed abuse allegations occurred after the 2003 change in custody. They were accompanied by the child's expressions of fear of losing her mother, rather than concerns relating to continued abuse by her father. Once the child made disclosures,[5] there was an immediate alliance with her mother, to the complete exclusion of her father, in sharp contrast to what occurred before.

---

5. Part of Greta's disclosures, as testified to by Dr. Silberg and reported by Dr. Snow and Dizard, included the following:

[Greta] said, "mi-ma is a lie, he said mommy lie, mommy not lie, Alex not lie, everything he said to you, he was doing, like happy."

So she is referring to the fact that she had seen him there with me, in a way as if everything is Greta's doing.

Like, "he not bad, really doing something too bad, mommy not doing bad, he was pushing my head with his hands," and she shows an up and down motion of her head, "on his poopie, feels bad, looks bad."

I was trying—I asked her whether he was wearing clothes, but, "he don't have clothes," and she said "oil comes from the poopie, just white, oil is under the poopie."

Then, she drew a picture of her head on his penis. "He said, don't tell mommy or daddy or teacher, he is really mean, he put finger in my pee-pee."

And then, I asked her how many times; "one time, two times, a lot of times, doing it when I'm sleeping, I'm not sleeping, and I don't like that." ...

So, this is an example of some of the things that she disclosed in that session, which she disclosed again later, and she—and I have a picture that—this is a picture of her, and she drew her head on her father's genitals.... Yes [she drew it at that time]. And that's something that she drew in a repeated way.... I have another picture from where she drew another picture of her head lying on her father's penis.

Another fact that I find persuasive is that the initial abuse claims, however unfounded, were made by [appellee] against Mr. Tarachanskaya. It is inconceivable to me that he would initiate a sexual ʾbuse investigation at a time when he himself was sexually abusing this child.

Another factor that weighs in my conclusion is the lack of documented symptomology that the child has been a victim of abuse. Although the symptoms that a child might experience after victimization can range significantly, none are clearly or independently documented in this child. In fact, other than the expressed fear of her father which began only after the child made graphic disclosures, [appellant] is the only person who relays concerns of other symptoms.

It would appear that Greta is generally a happy, well-adjusted child. At no time in this process has she demonstrated any difficulties at school. Teachers and independent observers have not noted any unusual behaviors or preoccupations. Until 2004, the child did not apparently exhibit any problematic behaviors in her father's care. Rather, the tensions occurred during transitions, which became increasing [sic] tense and difficult. Quite frankly, this escalation in tension when caught between her parents is something that has been building, and that every expert that evaluated this case in early years noted to be a cause for concern. Once this hit a breaking point, the dramatic and absolute shift in loyalties to her mother, to the complete exclusion of her father, is quite telling. Dr. Silberg clearly found [appellant] to be a credible source of information, motivated only by concerns for protection of her child. However over the course of the past nearly six years of these proceedings, there have been numerous occasions when I have found [appellant's] fears and projections to be without basis, particularly in the very early years of these proceedings.

The underlying conflict between these parents is long-standing, and for [appellant], it is exacerbated by the tension that also exists between her husband and [appellee]. [Appellee] has clearly aggravated this tension by his own behaviors which, at times, have been manipulative. [Appel-

lant's] life would be greatly simplified if [appellee] simply was not part of the picture. However well-intended she may be as a parent, this has colored her behavior and, in my judgment, her perceptions throughout Greta's life. I do not find or believe that [appellant] consciously coached the child to fabricate abuse allegations, or that she purposefully set out to create this serious of a rift. I do believe that both parents have contributed to the atmosphere of distrust and tension, to the detriment of their child. Both have demonstrated a lack of insight into their own roles in this deterioration.

The other significant factor is the lack of detail in disclosures made to Dr. Dizard [sic], once Greta had been removed from the tension between her parents for some period of time. The inconsistency in detail is another factor that, in my judgment, undermines the believability of the allegations.

For all those reasons, I simply do not find, based upon a preponderance of the evidence, that [appellee] has sexually abused his daughter.

Regardless of the findings on the abuse, we still have a child who is, at present, totally alienated from her father. As a result of the breakdown of the parental relationship between Greta and her father, there is a material change in circumstances. It is clear that the parents are unable to communicate or reach shared decisions in any respect, so joint custody is not an option. Accordingly, I find it is in Greta's best interest to place her in the legal and physical custody of her mother, [appellant]. However it is imperative that this child remain in therapy, and that such therapy include a plan for reunification services to repair the damage to the child's relationship with her father. This must be addressed in a therapeutic setting. The schedule for ongoing therapy shall be provided to [appellee] and his counsel, and to Greta's counsel. Further, the child's therapist must be asked to provide recommendations for reunification services, to include ongoing family therapy with Greta and each of her parents. Visitation between Greta and her father is

to occur only in a structured, therapeutic setting at present, and will be reassessed upon progress in therapy.

In a separate Order, the court directed that Greta be placed in the legal and physical custody of appellant and that Greta continue with regular therapy sessions. The court stated that "[t]he therapist shall be asked to provide a plan for reunification services to repair the damage to the child's relationship with her father. . . ." Appellee was to have no visitation with Greta but was "permitted to visit with his daughter in a therapeutic setting, under conditions to be explored with the current treating therapist." Both appellant and appellee were required to "participate in counseling and to reduce or eliminate parental conflict. . . ." In addition, the court ordered that "[a] report shall be filed setting forth the parameters of the reunification plan within 90 days, and a review of progress towards reunification may be set, upon request, after six (6) months."

The court's Memorandum Opinion and Order were dated July 8, 2005 and entered July 13, 2005. Appellant's timely appeal followed.

## LEGAL ANALYSIS

Appellant's first assignment of error is that the court, as a matter of law, failed to find, based on the "overwhelming weight of evidence," that Greta had been sexually abused by appellee. The court, according to appellant, applied the incorrect "burden of proof" under Family Law § 9–101 in reaching its conclusions. Appellant asserts that the court also abused its discretion in admitting Dr. Snow and Dizard as experts, admitting their opinions, and failing to "properly evaluate the credentials, experience, expertise and credibility of Dr. Silberg." Additional errors, as averred by appellant, include the court's failure to determine whether abuse would likely occur if appellee were granted visitation and the failure to establish specific conditions under which Greta could visit appellee that "would sufficiently assure the safety and the physiological, psychological, and emotional well-being of the child." Appel-

lant also contends that the court committed reversible error by delegating judicial authority to Greta's therapist to decide on "visitation parameters" for appellee and Greta and by ordering a reunification plan from the therapist. Finally, appellant claims that the court based its conclusions on testimony and evidence from previous hearings.

## I

### a. Reasonable Grounds to Believe

■ Md.Code (2004 Repl.Vol., 2005 Supp.), Fam. Law (F.L.) § 9–101 provides:

**§ 9–101. Rejection of custody or visitation if abuse likely**

Determine if abuse or neglect is likely

(a) In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

Deny custody or visitation if abuse likely

(b) Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

■ The Court of Appeals has recently explained that "[d]ecisions concerning visitation generally are within the sound discretion of the trial court, and are not to be disturbed unless there has been a clear abuse of discretion." *In re Billy W.*, 387 Md. 405, 447, 875 A.2d 734 (2005) (citations omitted). In light of § 9–101, "[b]ecause the trial court is required to make such determinations in the best interests of the child, visitation may be restricted or even denied when the child's health or welfare is threatened." *Id.* (citation omitted). Therefore, when "a court has reasonable grounds to believe

that neglect or abuse has occurred ... custody or visitation must be denied...." *Id.* (quoting § 9–101).

Appellant claims that the court committed reversible error by using the preponderance of evidence burden of proof when any analysis under § 9–101, appellant avers, requires that the court apply the "reasonable grounds" standard. Appellant maintains that § 9–101 requires courts to weigh and evaluate the evidence presented under the reasonable grounds standard, which has been characterized as akin to the term "probable cause," and that the standard of preponderance of the evidence is a "more stringent standard" than reasonable grounds. *Svedberg v. Stamness,* 525 N.W.2d 678, 682, n. 2 (N.D.1994)(Supreme Court of North Dakota construing that state's criminal code section 12.1–31.2–01, which grants a court the power to temporarily restrain conduct when it finds that there are reasonable grounds to believe an individual engaged in disorderly conduct). As a result, the court's finding that Greta did not suffer sexual abuse by appellee, based on a preponderance of evidence, is legally incorrect. We agree.

In construing § 9–101, we are mindful that

> ... the primary goal of [ ] [statutory interpretation] is to ascertain and effectuate the intention of the legislature. We first look to the text of the statute, giving the words their ordinary meaning. If the plain meaning of the statute is unambiguous, our inquiry into the legislature's intent is complete. If, however, ambiguity exists, we turn to surrounding circumstances, such as legislative history and the purpose behind the statutory scheme as a whole, to determine legislative intent.[6]

---

**6.** The Senate Judicial Proceedings Committee noted its legislative intent for then Senate Bill 320 in its Summary of Committee Report:

> The intent of Senate Bill 320 is to require a court either to prohibit visitation or custody or approve a supervised visitation arrangement if the court has reasonable grounds to believe that child abuse or neglect has occurred and there is likelihood of further abuse or neglect by the party.

*Ford v. Douglas*, 144 Md.App. 620, 624, 799 A.2d 448 (2002) (citations and quotation marks omitted).

We have previously examined the reasonable grounds standard in a different context within the area of domestic abuse. In *Katsenelenbogen v. Katsenelenbogen*, 135 Md.App. 317, 322, 762 A.2d 198 (2000) *vacated as moot*, 365 Md. 122, 775 A.2d 1249 (2001), where appellant challenged the entry of a protective order against him pursuant to the State Domestic Violence Act, codified at Family Law Article §§ 4–501 *et seq.*, we held that, if the wife's basis for the protective order was "fear of imminent serious bodily harm, the fear must be reasonable and ... the relief must be tailored to the situation being addressed."

We explained generally:

> [A]llegations of domestic violence are very serious, and the issuance of a protective order normally carries with it grave consequences for the perpetrator. If a protective order is issued without a sufficient legal basis, those consequences frequently cannot be erased. In that situation, the alleged perpetrator may suffer unfairly from the direct consequences of the order itself, which may include removal from his or her home, [or] temporary loss of custody of his or her children....

*Id.* at 335, 762 A.2d 198.

We then related the outcome of a protective order proceeding alleging abuse to the effect of child custody or visitation under § 9–101, noting:

> In making child custody determinations, a court weighs numerous factors, including the fitness of the parents, the character and reputation of the parties, and the length of separation of the child from the natural parents. A trial

---

The purpose of the bill is to provide for more expeditious decision-making in custody and visitation cases involving suspected child abuse or neglect.

Maryland Senate Judicial Proceedings Committee, S.B. 320 Committee Report at 2 (1984).

court might consider the issuance of a protective order against one parent when looking at any of these factors.

* * *

Furthermore, ... if a trial court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court must specifically find that there is no likelihood of further child abuse or neglect by the party in order to award custody or visitation rights to the party, except for a supervised visitation arrangement. F.L. § 9–101. A protective order issued by a court that states that one parent abused his or her child pursuant to F.L. § 4–501 would give a trial court reasonable grounds to believe that the child had been abused.

*Id.* at 336–37, 762 A.2d 198 (citation omitted).

Although the Court of Appeals vacated our judgment as having been moot due to the expiration of the subject protective order, the Court exercised its discretion and explored further the relationship between the issuance of a protective order and subsequent litigation concerning a family.

[O]nce a court has found from the evidence that abuse has occurred and that a protective order is needed to provide protection for the petitioner or other person entitled to relief, the court's focus must be on fashioning a remedy that is authorized under the statute and that will be most likely to provide that protection. If ... the court believes that protection of the petitioner requires that the parties be physically separated and that the respondent vacate the home, it should not hesitate to order that relief, along with any ancillary relief provided for in the statute, regardless of any potential impact on future litigation. ... [A] determination either to exclude the perpetrator from the family home ... will, in most instances, require the court to provide, among other things, for the temporary custody of any minor children, their support, the support of the victim, and visitation arrangements.

It is likely true, as the Court of Special Appeals noted, that the issuance of a protective order and the provision of

this kind of relief in it may have consequences in other litigation. A judicial finding, made after a full and fair evidentiary hearing, that one party had committed an act of abuse against another is entitled to consideration in determining issues to which that fact may be relevant. Living arrangements established as the result of a protective order may have relevance in determining custody. . . .

*Id.* at 136–37, 762 A.2d 198.

We hold that the court erred by failing to apply the reasonable grounds standard to the facts of the case *sub judice.* Notably, reasonable grounds was the standard articulated by the General Assembly when it drafted § 9–101. More significant to the discussion at hand are the previous pronouncements of this Court and the Court of Appeals concerning abuse allegations and the standard under which the allegations should be considered. Under settled case law, the factual bases for protective orders, based on physical abuse, must be reviewed under the objective standard of reasonableness. No logical reason exists, in light of the explicit language of § 9–101, for us to uphold application, by the lower court of the more stringent standard. Whether appellee sexually abused his daughter should have been determined by the reasonable grounds standard. Consequently, we vacate the Order of the circuit court and remand the case for further proceedings. On remand, the court shall reassess the evidence to discern if that evidence satisfies the lower threshold of reasonable grounds to believe that Greta was sexually abused by appellee, pursuant to § 9–101.

### b. Expert Testimony

█ Appellant next assigns error to the court's findings and conclusions concerning the qualifications of the expert witnesses, Dr. Snow and Social Services Investigator Rosalind Dizard at trial, admission of the opinions of Dr. Snow and Dizard as to whether Greta was sexually abused and the manner in which the court evaluated Dr. Silberg. Upon our review of the lower court's proceedings and perceiving no

clear abuse of discretion, we shall affirm the court's conclusions with respect to receipt of the expert testimony at trial.

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

*Md. Rule* 5–702 (2006).

Regarding expert testimony, we have explained:

> It is a time-honored rule of evidence that in order to qualify as an expert, [one] should have such special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate. Broad discretion is vested in the trial court with regard to expert testimony, and that discretion will not be disturbed on appeal absent an error of law or fact, a serious mistake, or clear abuse of discretion. We further note that objections attacking an expert's training, expertise, or basis of knowledge go to the weight of the evidence and not its admissibility.

*Johnson & Higgins of Pennsylvania, Inc. v. Hale Shipping Corp.,* 121 Md.App. 426, 444, 710 A.2d 318, cert. denied, 351 Md. 162, 717 A.2d 385 (1998) (citations and quotation marks omitted).

Appellant avers that neither Dr. Snow nor Dizard "demonstrated the minimal amount of competence to qualify as experts in this case." With respect to Dizard, a licensed social worker with a Master's Degree and employed with the Protective Services Unit of the Baltimore County Department of Social Services, appellant points to Dizard's "relatively short period of employment" with the agency of two years and notes

that her work with Baltimore County is her only experience with child sexual abuse investigations.

As the court noted, however, Dizard, during her current position, has investigated "three hundred to five hundred sex abuse" cases and, although she has not engaged in or authored any research or publications on the subject of child abuse, she testified that she had been certified to conduct sex abuse investigations by the Office of the Governor by attending a "thirty-six hour training." Dizard's employer, she explained, also required that, before she began conducting investigations, she had to go through a "series of trainings" that were considered "continuing education units." Additionally, Dizard's early experience included treatment of a number of children who had been referred as physical abuse or sexual abuse cases. We concur with the court's conclusion that Dizard's training and experience qualified her as an expert to "investigate and evaluate child sexual/physical abuse cases."

█ Regarding Dr. Snow, who has a Master's Degree and Ph.D. in Social Work, appellant similarly avers that he had limited experience with children of Greta's age who were victims of sexual abuse. Appellant stressed that Dr. Snow's experience was with older children affected by sexual abuse or as offenders, and criticized his lack of education, certifications and research experience in the area of child sexual abuse. Despite this purported "lack of credentials," the court qualified Dr. Snow as an expert, a conclusion with which we agree.

The court noted that Dr. Snow's work experience dated back "for over twenty years" since 1978 and involved "in some measure, sexual abuse evaluations, assessments and treatment." Although, at trial, appellant attempted to discredit Dr. Snow's experience by asseverating that his expertise was not in the specialty at hand,[7] the court properly concluded that Dr.

---

7. Counsel for appellant argued:

> There is absolutely nothing in his curriculum vitae that reflects any significant experience in the area of child sexual abuse, whether it be evaluation or treatment.

Snow's vast experience in the field of social work and in various states qualified him as an expert for the general disciplines for which he was proffered: "clinical evaluations, assessments and therapy." Dr. Snow's lack of "significant experience in child sexual abuse evaluation" is immaterial where the breadth and depth of his experience meets the minimal requirements to be qualified as an expert in the subject areas about which he testified. We therefore perceive no abuse of discretion in the court's decision to accept Dizard and Dr. Snow as expert witnesses.

■ The opinions of Dizard and Dr. Snow, according to appellant, were so "grossly lacking" the required factual foundation that the court abused its discretion in admitting their opinions that appellee did not sexually abuse Greta. A review of the record, however, indicates otherwise.

■ As previously noted

Under the well-established Maryland common law of evidence, *it is within the sound discretion of the trial court to determine the admissibility of expert testimony.* The Maryland Rules of Evidence, adopted by this Court in 1994, did not limit that discretion.... *A trial court's ruling either admitting or excluding such testimony "will seldom constitute a ground for reversal."* *Hricko v. State,* 134 Md.App. 218, 271, 759 A.2d 1107 (2000), *cert. denied,* 362 Md. 188, 763 A.2d 735 (2000)(alteration in original)(quoting *Sippio v. State,* 350 Md. 633, 648, 714 A.2d 864 (1998)). In addition, *"[a] factual basis for expert testimo-*

---

He is not certified or licensed in any way in the area of child sexual abuse evaluation and treatment.

He also, by his own admission, has only had occasion to work with a child between the ages of three and six, to do an evaluation in Maryland, on one occasion, and less than ten in Utah.... The bulk of his practice, the majority of his practice, is in—it involves parents and families in acrimonious divorce relationships, his therapy with parents and children.

His practice does not involve—it does not involve, in any material effect, the evaluation and treatment of children between the ages of three and six who have been allegedly sexually abused.

*ny may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others,* and facts related to an expert through the use of hypothetical questions." *Id.* at 273, 759 A.2d 1107 (alteration in original) (citation omitted).

Appellant urges that the opinions offered by Dizard and Dr. Snow were similar to the social work expert opinion reversed and deemed inadmissible by the Court of Appeals in *Bohnert v. State,* 312 Md. 266, 277, 539 A.2d 657 (1988). In that case, a social worker investigated whether Alicia, who was under the age of fourteen at the time of the event at issue, was the victim of sexual abuse by her mother's live-in boyfriend. The State requested that a social worker investigate the allegations. The social worker, Dora Temple, testified, detailing her investigation which consisted of "an interview of about an hour with Alicia at her school," speaking with Alicia's mother and a subsequent conversation with Alicia where she "related certain information to [Temple], which [Temple] deemed appropriate and necessary in gathering for [her] investigation." *Id.* at 271, 539 A.2d 657. Temple, opining that Alicia was a victim of sexual abuse, revealed on cross-examination that she had spoken to people other than Alicia and her mother to form her opinion, but those other people were not identified. *Id.* at 272, 539 A.2d 657. Temple further testified that she did not subject Alicia to any objective testing because she believed that "she had 'a certain sense about children' so that it was not necessary to give them tests." *Id.* at 272, 539 A.2d 657. In addition, the "[s]trongest part of [her] opinion [was] based on the child's statement, because of her age." *Id.* at 273, 539 A.2d 657.

The Court of Appeals concluded that "the very groundwork for Temple's opinion was inadequately supported [by the facts]." *Id.* at 276, 539 A.2d 657. The Court also had an alternative reason for concluding the trial judge erred in admitting the opinion, in addition to abusing his discretion, *i.e.,* that Temple's testimony as offered related "to the credibility of another witness" and "is to be rejected as a matter of law." *Id.* at 278, 539 A.2d 657. The Court reasoned:

The opinion of Temple that Alicia in fact was sexually abused was tantamount to a declaration by her that the child was telling the truth and that Bohnert was lying. In the circumstances here, the opinion could only be reached if the child's testimony were believed and Bohnert's testimony disbelieved. The import of the opinion was clear—Alicia was credible and Bohnert was not. Also, the opinion could only be reached by a resolution of contested facts—Alicia's allegations and Bohnert's denials. Thus, the opinion was inadmissible as a matter of law because it invaded the province of the jury in two ways. It encroached on the jury's function to judge the credibility of the witnesses and weigh their testimony and on the jury's function to resolve contested facts.

*Id.* at 278–79, 539 A.2d 657.

The *Bohnert* analysis is inapplicable to the case at bar. The opinions of Dr. Snow and Dizard were based upon investigations and reports that employed more acceptable forms of fact-gathering than those used in Temple's investigation and subsequent inadmissible opinion. Both Dr. Snow and Dizard conducted several interviews with all parties involved in the allegations of abuse of Greta. With respect to speaking to Greta, Dizard interviewed her individually at Greta's school, while Dr. Snow conducted eleven sessions that included Greta, appellant, appellee and Tarachanskaya. Dizard also spoke with Greta's guardian *ad litem* and reviewed both reports from Drs. Silberg and Snow before deciding whether abuse took place. Dr. Snow noted a session in his report in which he collaborated with Dr. Silberg and interviewed Greta without her parents present. Dizard listed her use of the RATAC Interview process during her interview with Greta and the child's demeanor indicated "she was telling the truth" about initially denying that she had been inappropriately touched or touched someone else. Dizard also used the Reid Technique of questioning when interviewing appellee, which indicated he was being truthful about not abusing Greta.

Clearly, the research and investigative techniques which Dizard and Dr. Snow utilized demonstrate that they possessed

more factual bases for their decisions than did Temple. All sources of information were identifiable, there were numerous contacts with all parties in order to confirm the experts' first-hand knowledge, and those contacts allowed them to weigh and evaluate each individual's demeanor. The experts also shared information between each other. The opinions here were certainly based upon more than Dr. Snow or Dizard's "sense of children" of a certain age who may have a stake in fabricating allegations of sexual abuse.

Furthermore, the trial did not involve a witness vouching for the credibility of another witness, as in *Bohnert*. In *Ware v. State*, 360 Md. 650, 679, 759 A.2d 764 (2000), the Court of Appeals reiterated that "[w]hether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper . . . ." (citing Joseph Murphy, Jr., Maryland Evidence Handbook § 603(C), at 250 (3d ed.1999)). *See also Riggins v. State*, 155 Md.App. 181, 207–209, 843 A.2d 115, *cert. denied*, 381 Md. 676, 851 A.2d 595 (2004)(distinguishing *Bohnert* when the subject testimony was not offered for the witness' belief about another witness' veracity). We therefore conclude that the opinions of Dr. Snow and Dizard were offered for their analysis and evaluation as to whether Greta was sexually abused by her father based upon the facts of their respective investigations, and not on the basis of whether they believed or disbelieved the testimony of other witnesses at trial.

Regarding expert testimony, appellant also contends that the court abused its discretion in failing to "properly evaluate the opinions, credentials, experience, expertise and credibility of Dr. Silberg." Although Dr. Silberg was specifically appointed by the court, appellant claims that, "[b]ased on the evidence at Trial [sic], the Trial Judge did not properly evaluate Dr. Silberg's opinion" and "did not identify any justification for completely disregarding Dr. Silberg's opinion that Greta had been sexually abused by her father." Appellant's contention is wholly without merit.

The gravamen of appellant's argument is that, because the trial judge agreed with Dizard and Dr. Snow, she did not

properly evaluate and consider Dr. Silberg's opinion; *ergo,* the judge is required to substantiate her reasoning for disregarding Dr. Silberg's opinion in rendering her findings of fact and conclusions. As stated, when it comes to matters concerning expert testimony, the trial court has broad discretion in accepting a witness as an expert and admitting or excluding the expert's opinion. It was within the purview of the trial judge to make findings of fact based on the evidence and to weigh and determine what evidence was persuasive and credible in reaching her conclusions in this case.

The judge heard conflicting testimony from the experts and appellee, who denied abusing Greta, and the judge found that Greta was not sexually abused by her father. Because the court specifically appointed Dr. Silberg to assess and evaluate Greta, it is apparent that the trial judge was familiar with Dr. Silberg's credentials and accorded serious consideration to her opinion in rendering a decision in this case. No further "evaluation" was necessary by the court. Moreover, as factfinder, a court, like the role of a jury, is not required to articulate reasons as to why evidence is credited or discredited. Notably, "a trial judge's failure to state each and every consideration or factor does not, without demonstration of some improper consideration, constitute an abuse of discretion, so long as the record supports a reasonable conclusion that appropriate factors were taken into account in the exercise of discretion." *Cobrand v. Adventist Healthcare, Inc.,* 149 Md.App. 431, 445, 816 A.2d 117 (2003).

The trial judge reviewed all exhibits and reports; she also witnessed the testimony of the experts and appellee and their demeanor before rendering her findings. Because the trial judge disregarded the ultimate opinion of an expert whose testimony supported appellant's position does not constitute an abuse of discretion.

## II

### Recurrence of Abuse

Appellant cites § 9–101 for the proposition that the court erred as a matter of law by failing to determine whether abuse

was likely to occur if visitation rights were granted to appellee, pursuant to subsection (a). In light of our discussion and holding in section I.a. *supra,* we will not address the merits of this issue. On remand, if the court determines that there are reasonable grounds to believe Greta was abused by appellee, it must then enunciate its determination of whether there exists the likelihood of recurring abuse. In such a case, unsupervised visitation must be denied. If the court discerns no reasonable grounds to believe the minor child was abused, it need not decide the issue of recurring future abuse.

### III

### Visitation Arrangement & Improper Delegation of Judicial Authority

■ We shall address appellant's third and fifth issues simultaneously. Regarding the visitation arrangement, appellant asserts that the court erred in failing to order that appellee's visitation with Greta be supervised and in issuing the Order without specific limits or instructions pertaining to the visitation arrangement. The court's Order stated "there shall be no visitation between [appellee] and his daughter," followed by "[h]owever [appellee] shall be permitted to visit with his daughter in a therapeutic setting, under conditions to be explored with the current treating therapist." The court also employed the term "structured, therapeutic setting" in its Memorandum Opinion to describe the conditions of visitation.

As previously noted, § 9–101 provides that it is mandatory that a trial court deny custody or visitation rights to a party in a case in which (a) it has grounds to believe that a child has been abused or neglected and (b) the court has not made a specific finding that there is no likelihood of further child abuse or neglect, with one express exception: "the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child." At first blush, it would appear that the provisions regarding visitation in the Memorandum Opinion and Order are facially conflicting, unequivocally denying visi-

tation, on one hand, and providing for visitation in a "structured therapeutic setting," on the other.

The court's Visitation Order is an apparent attempt to invoke the aforementioned exception under § 9–101(b). Stated otherwise, a "structured therapeutic setting" was intended by the court, in issuing its Order, to foster "the safety and the physiological, psychological, and emotional well-being of young Greta." F.L. § 9–101(b). Assuming, *arguendo*, that on remand, the court, in reassessing its findings under a reasonable grounds to believe standard, determined that there indeed was child abuse, a grant of visitation under a "structured therapeutic setting" would nevertheless comport with § 9–101(b). Inherent in the term "structured, therapeutic setting," we believe, is the requirement of supervision mandated by the statute. In ordering such a therapeutic setting, however, we believe that it would be preferable for the court to be more definitive as to who should supervise such visits and the frequency and schedule of such visits.

 Regarding appellant's assertion that the court improperly delegated judicial authority, it clearly sought to reunify appellee and Greta concomitant with its concerns of parental alienation. The court erred, however, in relegating to others material terms of appellee's visitation. The Court of Appeals, in *In re Mark M.*, 365 Md. 687, 707, 782 A.2d 332 (2001), vacated the trial court's because it failed to grant or deny visitation but rather declared that "[v]isitation will not occur until [the child's] therapist recommends it." The Court held that the trial court's ruling constituted an improper delegation to a third party of judicial authority to determine visitation. *Id.* The manner in which the court in the case *sub judice* relegated to the therapist reunification plans and recommendations, without specifically setting forth a defined visitation schedule, constituted an improper delegation of judicial authority. On remand, should the court order visitation between appellee and his daughter after reassessing the facts under the reasonable grounds to believe standard, it must clearly articulate a visitation schedule between appellee and

Greta, including the nature of any supervision by a therapist in order to "assure[ ] the safety" and meet the "physiological, psychological, and emotional" needs of Greta. F.L. § 9–101.

## IV

### Consideration of Evidence from Prior Proceedings

 To provide guidance to the lower court, on remand, we shall address appellant's final claim. Appellant asserts that the court committed reversible error by considering testimony and other evidence that was adduced at previous hearings and proceedings, but was not admitted into evidence in these proceedings. Specifically, appellant points to the trial judge's findings and conclusions where the judge discusses appellee's sexual abuse allegation of Greta against Tarachanskaya and the trial judge's "negative perception of [appellant]" as reasons for finding that appellee had not sexually abused Greta.

Appellant accurately notes, as did the trial judge in her Memorandum Opinion, that the judge had been specially assigned to this case since 1999 and, as a result, has considered and analyzed the facts and evidence of this case at various stages of the proceedings. We are satisfied, however, that the trial judge considered evidence properly before her during the trial from which this appeal was taken. As the judge explained, she considered testimonial evidence, as well as the exhibits that were introduced, in reaching her decision. Included in these exhibits were the assessment reports from Dizzard and Drs. Silberg and Snow, who had recorded their observations and the facts as they perceived them. With respect to appellee's accusations of sexual abuse against Tarachanskaya, knowing that an investigation may implicate appellee as the abuser, the record contains Dr. Silberg's testimony as to that very fact. She testified that, in an interview with appellee, he stated that the "first [sexual abuse] allegation ever made was made against Alex [Tarachanskaya]." Dr. Snow's report noted that "[i]nitial allegations of sexual abuse were directed toward Greta's step-father. . . ." Furthermore,

Dizard reiterated in her report, after interviews of all parties, that appellee went to Child Protective Services after Greta stated that Tarachanskaya had "touched her." Based upon this evidence, it was within the province of the trial judge to review these reports and reach the conclusion that it was "inconceivable" for appellee to initiate a sexual abuse investigation of Greta against Tarachanskaya if he were himself guilty of abuse.

Similarly, in regard to appellant's characterization of the trial judge's "negative perception" of her, there was evidence before the court of appellant's "conduct, behavior, fears and projections" from which the trial judge could have formed a conclusion with respect to appellant's actions, without hearing testimony from appellant. The judge acknowledged Dr. Silberg's findings in which she expressed her discernment that she "did not pick up a deceitfulness or evasiveness in the course of this interview or other lengthy interviews that followed" and that she "found no inconsistencies in her reports whenever [she] checked them out with documents." A finding that appellant was credible, however, would not negate the existence of conflict between the adults. The court reviewed Dr. Silberg's conclusion in addition to appellant's discussion of the history of the relationship and extramarital affair. Dr. Snow related in his report that "[appellant] and step-father have verbalized their desire to have [appellee] removed from [Greta's] life." Moreover, appellee not only testified about his relationship with his daughter, but he also testified about the continuing conflict between the parties and appellant's animus toward him. After reviewing such evidence, it was reasonable for the trial judge to make findings and conclusions which were supported by the evidence. The court did not err as a matter of law by considering evidence outside of the proceedings before it, where such evidence was merely confirmatory of the evidence in the instant proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY AFFIRMED AS TO EXPERT TESTI-MONY AND CONSIDERATION OF PRIOR PROCEED-INGS ONLY. JUDGMENT ORDER VACATED AND CASE**

REMANDED FOR FURTHER PROCEEDINGS CONSIS-
TENT WITH THIS OPINION.

COSTS TO BE PAID ONE–HALF BY APPELLANT
AND ONE–HALF BY APPELLEE.